George and Mary DALY, et al., Appellants,

v.

John A. VOLPE, as Secretary of Transportation, et al., Appellees.

No. 74–2566.

United States Court of Appeals, Ninth Circuit.

March 20, 1975.

Irving M. Clark, Jr., and J. Richard Aramburu (argued), Seattle, Wash., for appellants.

George R. Hyde, Atty., Dept. of Justice and Robert McIntosh, Asst. Atty. Gen., Olympia, Wash. (argued), for appellees.

Before CHOY and GOODWIN, Circuit Judges, and BURNS,* District Judge.

## OPINION

ALFRED T. GOODWIN, Circuit Judge:

The plaintiffs in this environmental action appeal the judgment by which the district court dissolved its injunction which had suspended construction of a segment of Interstate 90 between Seattle and Snoqualmie Summit in the state of Washington.

In Daly v. Volpe, 350 F.Supp. 252 (W.D.Wash.1972), the court had ordered state and federal defendants to prepare and circulate a draft environmental impact statement and enjoined construction pending compliance. The judgment approving that statement is found in Daly v. Volpe, 376 F.Supp. 987 (W.D.Wash. 1974).

Interstate 90 was planned to run from Seattle, Washington, to Boston, Massachusetts. In the Puget Sound region, the evidence showed that the freeway is expected to carry Seattle-area traffic to and from recreational facilities at Snoqualmie Summit, east of the segment challenged by the plaintiffs.

The challenged segment is approximately seven miles long. It will by-pass the town of North Bend. Now known as SR 90, Echo Lake to Tanner, the segment has been in the planning stage since the early 50's. Although the project was delayed by revised priorities, design and corridor hearings were undertaken in the late 1960's.

The original corridor close to North Bend was rejected in favor of a by-pass. In researching alternatives, planners considered five different corridors. All begin just southwest of the town of Snoqualmie and end in "Tanner," the western terminus of the next segment of Interstate 90. That segment is near completion.

This appeal challenges the sufficiency of the Environmental Impact Statement (EIS).

The National Environmental Policy Act of 1969, 42 U.S.C. § 4321 et seq. (NEPA), requires that an EIS serve two functions:

"(1) provide decision makers with an environmental disclosure sufficiently detailed to aid in the substantive decision whether to proceed with the project in the light of its environmental consequences, and (2) make available to the public, information of the proposed project's environmental impact and encourage public participation in the development of that information." Trout Unlimited v. Morton, 509 F.2d 1276, 1283 (9th Cir. 1974).

In achieving these purposes, NEPA is essentially a procedural statute. It is assumed that, if the prescribed procedures are followed, the agency will become aware of the environmental impact of the decisions it makes. Lathan v. Brinegar, 506 F.2d 677, 693 (9th Cir. 1974).

The role of the courts in reviewing agency compliance with NEPA is a very limited one. The court cannot substitute its judgment for that of the agency as to the necessity or desirability of the roadway, nor can the court bal-

---

* The Honorable James M. Burns, United States District Judge for the District of Oregon, sitting by designation.

ance the benefits of the road against its adverse effects on the environment. Jicarilla Apache Tribe of Indians v. Morton, 471 F.2d 1275, 1279–1280 (9th Cir. 1973). Unless the agency decision was so arbitrary and capricious as to amount to bad faith, the court cannot review the substantive decision of the agency. *See* Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); Calvert Cliffs Coordinating Committee v. United States Atomic Energy Commission, 146 U.S. App.D.C., 33, 449 F.2d 1109 (1971); Jicarilla Apache Tribe of Indians v. Morton, *supra*. *See also* Note, The Least Adverse Alternative Approach to Substantive Review Under NEPA, 88 Harv. L.Rev. 735 (1975). Rather, judicial review is limited to the question whether the agency action, findings, and conclusions are "without observance of procedure required by law." Administrative Procedure Act § 10(e)(4), 5 U.S.C. § 706(2)(D); Lathan v. Brinegar, 506 F.2d at 693.

█ The district court found that the EIS in question here was produced in accordance with the procedure required by law. We are bound by the facts as found by the district court unless they are clearly erroneous. Fed.R.Civ.P. 52(a); Sessions, Inc. v. Morton, 491 F.2d 854, 858 (9th Cir. 1974).

Appellants question the procedure followed by defendants in three particulars. First, they contend that proper procedure would have involved the drafting of a comprehensive EIS covering the roadway from Seattle to Snoqualmie Summit. Second, they argue that proper procedure would have involved consideration of more corridor alternatives than the five considered. And third, they contend that proper procedure would have involved a more stringent cost-benefit analysis than is found in the EIS submitted. We shall consider each of these contentions in turn.

## THE UMBRELLA EIS ISSUE

In contending that the Washington State Department of Highways should have prepared an EIS that covered Interstate 90 between Seattle and Snoqualmie Summit, appellants misread the requirements of NEPA.

█ In regulations promulgated to effect the goals of NEPA, the federal highway administration (FHA) has determined that an EIS should cover a "highway section" that is "as long as practicable to permit consideration of environmental matters on a broad scope. Piecemealing proposed highway improvements in separate environmental statements should be avoided. If possible, the highway section should be of substantial length that would normally be included in a multi-year highway improvement program." FHA Policy and Procedure Memorandum 90–1 (PPM), paragraph 6.

PPM 90–1 goes on to define "highway section" as "a substantial length of highway between logical termini (major crossroads, population centers, major traffic generators, or similar major highway control elements) as normally included in a single location study." PPM 90–1 section 3(A).

Although the word "major" modifies the words "crossroads", and "traffic generators", and "highway control elements", it is not used in conjunction with "population centers". One reason for this may be that crossroads, traffic generators, and highway control elements are so numerous that the choice of two of these points for the termini of a highway section would easily be arbitrary; "major" crossroads, traffic generators and highway control elements, on the other hand, are fewer, thus creating regulating parameters for segmentation choices.

Population centers are of a different nature, however. Whether "major" or "minor", they grow up in answer to the perceived needs of a human population, and tend to be relatively permanent. They have public visibility and importance independent of their function in traffic regulation. Thus, population centers, whether "major" or "minor", also

can serve as regulating parameters for segmentation choice.

Exclusive reliance on the criteria propounded by the FHA could, however, also result in arbitrary choices by highway builders. Thus, case law has developed other criteria that enhance the guidelines of PPM 90–1.

One such criterion is that requiring the section in question to have "independent utility". Indian Lookout Alliance v. Volpe, 484 F.2d 11, 19 (8th Cir. 1973). As the court said in Movement Against Destruction v. Volpe, 361 F.Supp. 1360 (D.Md.1973), aff'd per curiam, 500 F.2d 29 (1974):

> "In some situations the relationship of several roads or parts of road may be so interrelated that no one road or part of a road can function as an efficient carrier of motor vehicles except in conjunction with the others. In such a case, it is possible that it would be necessary to have an EIS which would have as its subject all of the roads or parts of roads which could only function efficiently as a unit. In such an unusual situation, the several roads would not constitute a system of highways but would be treated essentially as a single highway for the purposes of the EIS." 361 F.Supp. at 1384.

Another criterion for determining the reasonableness of a proposed highway segment "is whether the length selected assures adequate opportunity for the consideration of alternatives * * * required by the Act * * * ." Committee to Stop Route 7 v. Volpe, 346 F.Supp. 731, 740 (D.Conn.1972), aff'd per curiam, sub nom. Citizens for Balanced Environment & Transportation, Inc. v. Volpe, 503 F.2d 601 (2d Cir. 1974). Here the focus is on alternatives in the immediate area of the proposed segment, although more widespread regional environmental considerations and alternatives should be discussed and considered. Movement Against Destruction v. Volpe, 361 F.Supp. at 1384–5. Furthermore, as the court pointed out in Indian Lookout Alliance v. Volpe, 484 F.2d at 19, in some instances "umbrella" impact statements could have the effect of encompassing so much territory as to defeat clear understanding of the issues, as well as ordered community response.

■ In evaluating the interaction of the criteria mentioned above, it is important to keep in mind that although Congress has mandated that environmental exigencies must be considered by an agency, Congress has nowhere determined that such considerations must work to the abandonment of other federally mandated goals and projects. Specifically, Congress has not determined that the interstate highway traffic-moving goals set out in the Federal-Aid Highway Act of 1956, 23 U.S.C. § 101 et seq., should be set aside whenever a highway would have some detrimental effect on the environment.

Further, the segment under consideration seems to fulfill important state and local needs. The congestion in North Bend and the surrounding area has been under discussion since the 1950's. None of the parties has seriously questioned the importance of a North Bend by-pass. *See* Indian Lookout Alliance v. Volpe, 484 F.2d at 19.

■ Considering the criteria and warnings offered by various courts on this subject, it is clear that if a portion of roadway is bounded by two of the elements mentioned in PPM 90–1, has independent utility, is long enough to ensure adequate consideration of alternatives, and fulfills important state and local needs, that portion is a suitable one for consideration in a single EIS.

The highway segment here runs between a "population center" on the west, and a "major highway control element" on the east. However, neither terminus can be seen as unequivocally "logical": The population center is clearly "minor", having a population of approximately 1,300 persons (EIS p. 14). The "highway control element" also has a trace of arbitrariness to it being merely the next segment of the same interstate. Since neither terminus is totally free of the charge of arbitrariness, the other criteria

assume greater importance than if this were not the case.

The roadway in question appears to have independent utility as a by-pass for the town of North Bend, which is currently plagued by extreme congestion. Appellants contend that independent utility must be evaluated in terms of the "primary" purpose of the roadway (which they assert is to form part of an interstate system) rather than the "secondary" purpose of alleviating congestion in a small town. This argument, carried to its logical extreme, would require, as a precondition to any by-pass or interchange, a reassessment of the utility of matters Congress passed upon when it established the interstate highway system. We believe the utility of a segment can be properly evaluated along with its costs and environmental impact as part of an integrated study.

The highway segment in question appears to be long enough to provide for an adequate discussion of alternatives. Not only does the statement discuss roadway alternatives within the study area itself, and their environmental impacts, it also discussed and ties in regional alternatives and environment considerations. Although discussion of regional alternatives and environmental factors is not exhaustive in this specific EIS alone, the discussion is adequate to demonstrate that highway planners have taken such factors into consideration in making their decisions. In addition, the segment will be under construction for three years, a fact which meets the suggestion offered in PPM 90–1 that the segment be of a length usually incorporated in a multi-year highway project.

The district court has determined that segmentation of the highway in question was proper, and that an "umbrella" EIS is not required. These findings are not clearly erroneous.

### THE ALTERNATIVES ISSUE

Appellants' second principal objection is that, had the Washington State Highway Commission followed correct procedures in preparing the EIS, that statement would have discussed more alternatives than it does. Specifically, appellants argue that the statement omits a discussion of the alternative under consideration in the late 1950's, that is, use of the existing road combined with a by-pass in the immediate area of downtown North Bend.

Appellants have not shown that the district court was clearly erroneous in its determination that the discussion of alternatives in the EIS was reasonable. 376 F.Supp. at 994. The record shows that the EIS discusses, in some form, all alternatives under serious consideration since the late 1950's, including the one advanced by appellants. The fact that appellants' route is not discussed *per se,* in the exact dimensions proposed by appellants, does not make the EIS unreasonable.

The district court, in granting the preliminary injunction, ordered preparation of another EIS. The appellants imply that, because the resulting EIS recommends the same route as did the prior EIS, the preparation of the new EIS must have a mere exercise. Appellants apparently reason that, had any thought been given to the new EIS, a different route would have been chosen. This attempt to monopolize wisdom overlooks the presumption of regularity that must be given to administrative decisions. Citizens to Preserve Overton Park v. Volpe, 401 U.S. at 415. There is no showing that the administrative action was irregular and taken in bad faith. We will assume therefore that the EIS is not a sham.

### THE COST–BENEFIT ANALYSIS

Appellants' final claim is that the EIS is inadequate in its attempt to balance environmental considerations with economic costs. Specifically, appellants contend that the statement inadequately quantifies costs, benefits, and values, and that the balancing that does occur is too scattered and confused to be effective.

Appellants' contentions stem from Section 102(2)(B) of NEPA, 42 U.S.C.

**1112**

§ 4332(2)(B), which states in pertinent part that all agencies of the Federal Government shall:

" * * * identify and develop methods and procedures * * * which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decision making along with economic and technical considerations."

The quoted section was interpreted in Calvert Cliffs Coordinating Committee v. United States Atomic Energy Commission to require a balancing analysis of the factors at work in each specific situation. 449 F.2d at 1113.

In Trout Unlimited v. Morton, 509 F.2d at 1286, this court considered the type of balancing analysis that is required in light of the present state of the technology available to conduct the required studies. We concluded that "a formal and mathematically expressed cost-benefit analysis" is not presently required by NEPA. 509 F.2d at 1286. In light of the district court's finding that the important quantifiable elements were included in the statement, 376 F.Supp. at 995, *Trout Unlimited* indicates that appellants' first contention is without merit.

There remains, however, the question whether the balancing analysis in the EIS is too "scattered and confused" to fulfill its function of providing resource material to the decision-makers and the public.

On this point, the district court found that the final EIS informed its readers of the potential environmental cost of the project. It provides detailed information about each alternative and attempts to weigh the effects of each course of action. Obviously not every potential environmental consideration has been discussed. However, the key quantifiable effects of the various alternatives are included in the statement. 376 F.Supp. at 995.

Although it may be true that the final EIS is not a stellar example of organization, in that additional cross-references

and clarifying explanations might have been helpful, there is no basis for a conclusion that the district court was clearly erroneous in its decision.

Affirmed.