NATIONAL WILDLIFE FEDERATION; Eastern Connecticut Citizens Action Group, Inc.; Stop I–84, Inc., of Rhode Island; Connecticut Committee of Correspondence, Inc.; Connecticut Fund For the Environment, Inc.; Connecticut Wildlife Federation; Save Our State Committee, Inc.; and Sierra Club

v.

Drew LEWIS, Secretary of Transportation; Robert E. Kirby, Regional Federal Highway Administrator, Region 1; Donato J. Altobelli, Division Administration for Connecticut, Federal Highway Administration; and Arthur B. Powers, Commissioner, Connecticut Department of Transportation.

Civ. A. No. H 80–47.

United States District Court,
D. Connecticut.

July 22, 1981.

David G. Burwell, Washington, D.C., Haynes N. Johnson, Parmalee, Johnson,

Bollinger & Bramblett, Stamford, Conn., Daniel Millstone, New Haven, Conn., Arlene Violet, Providence, R.I., for plaintiffs.

Frank H. Santoro, Asst. U.S. Atty., New Haven, Conn., Richard Blumenthal, U.S. Atty., for the Dist. of Conn., New Haven, Conn., Ezra D. Rosenberg, Atty., Land and Natural Resources Division, U.S. Dept. of Justice, Washington, D.C., for defendants Drew Lewis, Robert E. Kirby and Donato J. Altobelli.

Kenneth N. Tedford, Susan T. Pearlman, Asst. Attys. Gen., Wethersfield, Conn., Carl R. Ajello, Atty. Gen. of the State of Conn., Hartford, Conn., for defendant Arthur B. Powers.

Thomas C. Clark, Grant H. Miller, Jr., Hartford, Conn., Clark, Mayo & Gilligan, Hartford, Conn., for amicus curiae I–84 Yes, Inc.

## SUPPLEMENTAL MEMORANDUM AND RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT ON ISSUES CONCERNING THE I–84/I–86 CONNECTOR

JOSÉ A. CABRANES, District Judge:

### Introduction

In this action, plaintiffs challenge, *inter alia*, the decision of the United States Department of Transportation ("DOT") and its constituent agency, the Federal Highway Administration ("FHWA"), to build a connecting highway between Interstate Routes 84 and 86 ("I–84" and "I–86") east of Hartford, Connecticut. The proposed project, known as the "I–84/I–86 Connector," would widen 3.5 miles of existing highway and construct 1.4 miles of new highway in the towns of East Hartford and Manchester, Connecticut. In a previous opinion, familiarity with which is assumed, the court denied plaintiffs' request for review of defendants' plans for two proposed extensions of I–84 in eastern Connecticut. *See National Wildlife Federation v.*

*Goldschmidt*, 504 F.Supp. 314 (D.Conn. 1980).[1] Plaintiffs contend that, in unconditionally approving the design and location of the Connector, DOT and FHA failed to comply with the obligations imposed by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, the Federal-Aid Highway Act ("Highway Act"), 23 U.S.C. § 101 *et seq.*, and the Department of Transportation Act ("DOT Act"), 49 U.S.C. § 1651 *et seq.* They argue, in particular, that defendants (1) failed to analyze fully either the need for, or the environmental effects of, the Connector; and (2) failed to plan sufficiently to minimize the harm to public park land which would be caused by the Connector. As a result, plaintiffs contend, the defendant federal agencies violated the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A), which bars final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" On that basis, plaintiffs seek to enjoin further design and eventual construction of the Connector.

▮▮▮ In approving the design and location of the Connector, the federal defendants were exercising the authority which Congress has delegated to them by law. Accordingly, the decision of these expert administrative agencies is entitled to considerable deference. In reviewing that decision, the role of the court is limited. The court must ensure that defendants have complied with the procedures required by Congress. It must carefully scrutinize the facts on which defendants based their decision, and determine whether the decision was reasonable. The court may not, however, substitute its own judgment for that of the agencies. As long as defendants have adhered to the applicable procedures and reasonably analyzed the relevant facts, their decision must stand.

Having reviewed the record in this case, the court concludes that, in approving the

---

1. On February 6, 1981, at oral argument on the present cross-motions for summary judgment, the court directed, with the consent of all counsel, that the current Secretary of Transportation, Drew Lewis, be substituted for his predecessor, Neil Goldschmidt, as a defendant in these proceedings.

design and location of the Connector, defendants complied with their obligations under applicable law. Accordingly, the court finds no basis for granting plaintiffs the relief they seek and the defendants' cross-motions for summary judgment are granted.

### Background

The decision to build the Connector has been years in the making. I–84 is an interstate highway which, in Connecticut, extends eastward from the New York-Connecticut state line, past Hartford and through East Hartford, Connecticut. Beginning at the East Hartford-Manchester town line, this highway is designated I–86 and extends northeastward toward Boston, Massachusetts. What is today the I–84/I–86 highway was first opened to traffic in 1948 as the Wilbur Cross Highway. Final Environmental/Section 4(f) Statement, Interstate Routes 84 & 86 ("Final EIS") at 3 (Nov. 19, 1979). In 1958, this highway was included in the National System of Defense and Interstate Highways (the "Interstate Highway System").[2]

In 1971, a new 7.1 mile portion of the Interstate Highway System was opened to traffic in Manchester, Connecticut. This segment of highway extends eastward from Spencer Street, Manchester to Bolton Notch in Bolton, Connecticut. Although this 7.1 mile section of highway is also designated "I–84," it does not connect with either I–84 in East Hartford or I–86 in Manchester. Instead, it ends slightly to the east of the East Hartford-Manchester town line, about 1.4 miles south of the principal artery of the I–84/I–86 highway. Because there is no expressway link between these two sections of the interstate highway, traffic flowing between the two highways is routed along the city streets of East Hartford and Manchester. This has resulted in abnormally heavy traffic along these local roads. Final EIS at 9.

Since 1959, there have been plans to connect these two segments of the interstate highway. Until 1974, it was expected that a new expressway, designated as I–491, would be built for this purpose. I–491 would have extended from the I–84/I–86 interchange at the East Hartford-Manchester line, to the western end of the interstate highway in Manchester, and then southerly toward Glastonbury, Connecticut. Final EIS at 3. In 1970, with the passage of NEPA, DOT became subject to the requirement that it give formal consideration to the environmental impact of all proposed major highway projects. Accordingly, DOT prepared, in 1973, a draft environmental impact statement ("draft EIS") in connection with the projected construction of I–491. Later, when the plans for I–491 were withdrawn, DOT withdrew its draft EIS as well.[3]

Subsequently, the plans for I–491 were replaced by the present, more modest plan for the I–84/I–86 Connector. The project would improve about 3.5 miles of existing highway and construct about 1.4 miles of new expressway. It consists of three elements. The first is to improve about two miles of the existing I–84 in East Hartford. The highway right-of-way would be widened to accommodate five traffic lanes in each direction, including one priority lane in each direction for buses and carpool vehicles. Existing ramps would be expanded, and new ramps would be built, to improve access between I–84 and the city streets of East Hartford. Final EIS at (i) and 4–5.

The second element of the project is to build a new expressway of about 1.4 miles.

---

2. Congress established the 41,000-mile Interstate Highway System, in part, "to connect by routes, as direct as practicable, the principal metropolitan areas, cities, and industrial centers, [and] to serve the national defense . . . ." 23 U.S.C. § 103(e)(1). As envisaged by Congress, the highways in this system "may be located both in rural and urban areas." *Id.*

"The routes of the system, to the greatest extent possible, shall be selected by joint action of the State highway departments of each State and the adjoining States, subject to the approval by the Secretary [of Transportation]. *Id.*

3. *See* Affidavit of Arthur B. Powers, sworn to September 25, 1980, ¶ 3(a).

It would begin at the western end of the interstate highway segment in Manchester and then run in a northwest direction, meeting the I–84/I–86 highway at a point near the East Hartford-Manchester town line. This new expressway would occupy a right-of-way of about 1000 feet, and would include two traffic lanes in each direction. It would include interchange ramps to connect the new expressway with existing highways, as well as entrance and exit ramps to provide access to local streets. *Id.*

The third and final element is to improve about 1.5 miles of the existing I–86 highway in Manchester. The highway right-of-way would be widened to accommodate six traffic lanes, including one priority lane, in each direction. Two of the lanes in each direction would be "collector distributor roads"—that is, they would link the existing highway with the newly constructed expressway, as well as providing additional access between the highway and the local streets of Manchester. *Id.*

Pursuant to NEPA, DOT prepared a draft EIS for the Connector. Because the proposed project would involve the use of land that had been set aside as public parks, DOT was further required, by both the DOT Act and the Highway Act, to prepare a so-called "Section 4(f) statement" which described DOT's efforts to avoid the use of park land for the project. *See* Section 4(f) of the DOT Act, 49 U.S.C. § 1653(f), and 23 U.S.C. § 138. Pursuant to FHWA regulations, 23 C.F.R. § 771.19(f), the Section 4(f) statement was included in the draft EIS. In 1976, pursuant to FHWA regulations, 23 C.F.R. §§ 771.12(h) and (i), defendants circulated the draft EIS for comment to public agencies and private organizations which possessed either expertise or an interest in the social and environmental impact of the project. In 1977, pursuant to 23 C.F.R. § 790.5, defendants conducted public hearings on the Connector draft EIS in both East Hartford and Manchester.

In 1978 and 1979, defendants approved the final EIS for the Connector. In 1978, defendant Kirby, the Regional Federal Highway Administrator for the Connecticut area, submitted the final EIS to FHWA headquarters in Washington, D.C. for the "prior concurrence" required by 23 C.F.R. § 771.14(c). On October 12, 1979, defendant Goldschmidt, through the FHWA, granted DOT's prior concurrence. On November 19, 1979, defendant Kirby unconditionally approved the final EIS for the Connector, and thus gave final approval to the design and location for the Connector which were proposed in the final EIS.[4]

Plaintiffs commenced this action on January 28, 1980. They originally sought to enjoin construction of three projected additions to the I–84 system: (1) a 12.6 mile segment of I–84 which would link Bolton and Windham, Connecticut ("Section I"); (2) a 17.8 mile segment which would run from Windham to the Connecticut-Rhode Island border at Killingly, Connecticut ("Section II"); and (3) the I–84/I–86 Connector. On November 19, 1980, this court ruled that because DOT had not authorized either construction or land acquisition with respect to Sections I and II, plaintiffs' claims concerning those proposed extensions were not ripe for adjudication. Accordingly, the court denied plaintiffs' application for injunctive relief and granted defendants' motion for summary judgment, with respect to Sections I and II. *National Wildlife Federation v. Goldschmidt, supra.* Inasmuch as DOT had unconditionally approved the final EIS for the Connector, thus approving the design and location of that project, that agency decision was unquestionably ripe for judicial review. The court found, however, that the issues concerning the Connector had not been fully briefed by the defendants. In view of the defendants' request for an opportunity to submit additional briefs, the court deferred review of the Connector issues but ordered defendants not to perform any land acquisition for, or construction of, the Connector

---

4. *See* Complaint, ¶¶ 29–31 (filed Jan. 28, 1980) (admitted, in pertinent part, by defendants in their respective answers).

pending the outcome of that decision. In December 1980, both sides filed supplemental briefs concerning the Connector. On February 6, 1980, the court heard additional oral argument. In this supplemental ruling, the court addresses the remaining issues in the action.

The parties agree in framing three issues for the court. The first is whether the Connector has a "utility" which is "independent" of that of the proposed Sections I and II. The second is whether the final EIS for the Connector is inadequate. The third is whether the Section 4(f) statement on the use of park lands is deficient.[5]

### The "Independent Utility" of the Connector[6]

In planning Sections I and II and the Connector, defendants prepared a separate draft EIS, and conducted separate public hearings, for each of these three proposed projects. Plaintiffs contend that, by not preparing a single draft EIS for the entire I–84 system and by not conducting unified public hearings, the defendants committed an error under applicable law. *See* Complaint, ¶¶ 50–55.

It is the policy of the FHWA that "in the development of a project a *systematic* interdisciplinary approach be used to assess engineering considerations and beneficial and adverse social, economic, environmental, and other effects[.]" 23 C.F.R. § 771.2 (emphasis added). To achieve the goal of systematic project evaluation, FHA regulations provide that "[p]iecemealing proposed highway improvements in separate EIS's is to be avoided." 23 C.F.R. § 771.5(a). Moreover, the "highway section identified in the EIS ... should include *the total length of highway between logical termini* even though only a short length of the total

identified highway section is proposed for construction or reconstruction within the multiyear work program." *Id.* (emphasis added).

The definition in the regulations of a "highway section," 23 C.F.R. § 771.3(g), also provides part of a definition of "logical termini":

A "highway section" is a highway development proposal between logical termini (*population centers, major traffic generators, major crossroads, etc.*) as normally included in a location study of a multiyear highway improvement program.

(emphasis added)

■ In determining whether a proposed highway section is sufficiently long to permit a separate EIS, a court must consider several related factors. The first is the "nature of the proposal." *Committee to Stop Route 7 v. Volpe*, 346 F.Supp. 731, 740 (D.Conn.1972) (Newman, J.). The second is whether the project has "independent utility," *Daly v. Volpe*, 514 F.2d 1106, 1110 (9th Cir. 1975), or whether, instead, "construction of this span is dependent upon construction of the entire highway." *Citizens for Balanced Environment and Transportation, Inc. v. Volpe*, ("*Citizens for Balanced Environment I*"), 376 F.Supp. 806, 813 (D.Conn.1974) (Newman, J.), aff'd, 503 F.2d 601 (2d Cir. 1974), *cert. denied sub nom. Citizens for Balanced Environment & Transportation, Inc. v. Coleman*, 423 U.S. 870, 96 S.Ct. 135, 46 L.Ed.2d 100 (1975). The third is whether the project connects "logical," or "major," termini. 23 C.F.R. § 771.3(g); *Indian Lookout Alliance v. Volpe*, 484 F.2d 11, 19 (8th Cir. 1973). The fourth is "whether the length selected assures adequate opportunity for the consideration of alternatives (both whether and

---

5. Brief of Federal Defendants on Issues concerning I–84/I–86 Connector at 2 (Dec. 3, 1980); Reply Brief of Plaintiffs on Issues Concerning the I–84/I–86 Connector ("Plaintiffs' Reply Brief") at 1 (Dec. 22, 1980).

6. In framing the first issue for the court, the parties have simply asked whether the Connector has an "independent utility." In fact, the issue before the court is somewhat broader—

namely, whether the proposed Connector is of sufficient length and scale to merit consideration by defendants in public hearings and in a final EIS which were undertaken apart from those for the other proposed sections of I–84. As the discussion below indicates, a highway's "independent utility" is only one of the factors which a court must examine in resolving that question.

where to build) required by [NEPA]." *Committee to Stop Route 7 v. Volpe, supra,* 346 F.Supp. at 740.

In their memorandum of law, plaintiffs appear to retreat from the attack that they had launched in their complaint. In the complaint, plaintiffs alleged that defendants had acted unlawfully in giving separate consideration to the proposed Connector. *See* Complaint, ¶¶ 50–55. In their memorandum of December 22, 1980, plaintiffs "reaffirm their previous agreement that 'some new construction is needed in the I–84/I–86 Corridor' and, therefore, there is 'independent utility' for *some* construction." Reply Brief of Plaintiffs on Issues Concerning the I–84/I–86 Connector ("Plaintiffs' Reply Brief") at 1 (emphasis in the original). Before *any* construction could proceed, however, defendants were required to prepare an EIS for the project. Thus, if it is conceded that there is an independent utility for at least some construction of the project, it would seem to follow, *a fortiori,* that the project has a sufficiently "independent" utility *to* warrant analysis in an independent EIS.

■ In any event, an analysis of the relevant factors in light of the circumstances of this case makes clear that defendants did not act unreasonably when they concerned themselves with the Connector alone. The proposed project would link, by an expressway, two existing segments of the Interstate Highway System. That link is made necessary, as to a great extent even plaintiffs appear to concede, by present and projected future traffic patterns on the highway segments which already exist.

The defendants' analysis of traffic patterns revealed that, as of 1976, "[l]ocal roads in the breach between the two sections of I–84 [were] carrying abnormally heavy traffic[.]" Final EIS at 9. Projections of future use of existing roadways indicated that the problem will become worse. For example, this complex of expressway and local roads reached the so-called "saturation level" of traffic for two hours during each afternoon rush during 1976. Based upon their projection of traffic

growth, defendants anticipated that this "p. m. saturation" would increase to three hours each day by 1980, and to five hours each day by year 2000. Final EIS at 9–10.

The bulk of the traffic burden is being generated west of the area of the proposed Connector. As of 1976, the estimated two-way, average daily traffic ("ADT") on existing I–84 in East Hartford, west of the site of the proposed Connector, was 79,000 vehicles. On existing I–86 in Manchester, east of the Connector site, the ADT was 51,000 vehicles. On the portion of existing I–84 in Manchester, east of the Connector site, the ADT was only 11,000 vehicles. Thus when analyzing the need for the Connector, defendants concluded that the "critical stretch of expressway is the three lane section of EXISTING I–84 between Forbes Street and Simmons Road" in East Hartford. Final EIS at 9 (emphasis in the original). Defendants noted that various alternatives were then being considered for the continuation of I–84 through eastern Connecticut to Providence, Rhode Island. Recognizing that the need for the Connector was being generated largely by traffic from west of the proposed construction site, defendants concluded that "none of the alternates [sic] [for continuation of I–84 in eastern Connecticut] reduce[s] the need for this project." *Id.*

The key purpose of the Connector, then, is "to provide safe, fast and efficient expressway travel service and to relieve the congestion of local streets[.]" Final EIS at (ii). Since the traffic burden on local streets is being created by existing segments of interstate highway, the Connector would clearly be linking "logical termini." 23 C.F.R. § 771.3(g) (logical termini include "major traffic generators"); *see also Daly v. Volpe,* 376 F.Supp. 987, 993 (W.D.Wash. 1974), *aff'd,* 514 F.2d 1106 (9th Cir. 1975) (where a proposed highway segment was "designed to route traffic around [a] population center [,] thereby relieving the current heavy level of congestion," the intended segment was held to "link logical termini"). Because the need for the Connector does not depend on the eventual construc-

tion of any of the proposed options for completing I–84 in eastern Connecticut, the court finds that the Connector has an "independent utility" for purposes of analyzing alternatives under NEPA. *See Citizens for Balanced Environment I, supra,* 376 F.Supp. at 813.

Because the purpose of the Connector is to link previously constructed highway segments, defendants had little choice as to the length of the project. *See* Final EIS at 5, 8. Any inadequacy in the number or nature of alternative routes considered, therefore, may not be attributed to the "length selected" for the Connector by defendants. *See Committee to Stop Route 7 v. Volpe, supra,* 346 F.Supp. at 740. Accordingly, the court concludes that the length and scale of the Connector project are sufficient to have permitted defendants to prepare a final EIS for that project only, without regard to the possible extension of I–84 through eastern Connecticut.

### The Adequacy of the Connector EIS

All parties to this action agree that, in planning the Connector, defendants were required by NEPA to prepare a "detailed statement" concerning, *inter alia,* "the environmental impact of the proposed action," 42 U.S.C. § 4332(2)(C)(i); "any adverse environmental effects which cannot be avoided should the proposal be implemented," 42 U.S.C. § 4332(2)(C)(ii); and "alternatives to the proposed action," 42 U.S.C. § 4332(2)(C)(iii). In this case, the final EIS for the Connector represents the attempt of defendants to comply with these requirements of NEPA. Plaintiffs seek judicial review of the adequacy of that statement.

Although "NEPA does set forth significant substantive goals for the Nation," its "mandate to the agencies is essentially procedural." *Vermont Yankee Nuclear Power Corp. v. NRDC,* 435 U.S. 519, 558, 98 S.Ct. 1197, 1219, 55 L.Ed.2d 460 (1978). The duty of a federal court is "to insure a fully informed and well-considered decision" by the agency through its compliance with the requirements of NEPA, *id.; Citizens for Balanced Environment and*

*Transportation, Inc. v. Volpe* (*"Citizens for Balanced Environment II"*), 650 F.2d 455, 460–461 (2d Cir. 1981). Once it has been determined that the agency has followed NEPA's procedural requirements, "the only role for a court is to insure that the agency has considered the environmental consequences; it cannot 'interject itself within the area of discretion of the executive as to the choice of the action to be taken.'" *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227–228, 100 S.Ct. 497, 500, 62 L.Ed.2d 433 (1980), *quoting Kleppe v. Sierra Club,* 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n. 21, 49 L.Ed.2d 576 (1976); *Citizens for Balanced Environment II, supra,* at 460–461. In determining whether the agency decision has been "fully informed and well-considered," *Vermont Yankee Nuclear Power Corp. v. NRDC, supra,* 435 U.S. at 558, 98 S.Ct. at 1219, a court is governed by a "rule of reason," under which

> an EIS need not be exhaustive to the point of discussing all possible details bearing on the proposed action but will be upheld as adequate if it has been compiled in good faith and sets forth sufficient information to enable the decision-maker to consider fully the environmental factors involved and to make a reasoned decision after balancing the risks of harm to the environment against the benefits to be derived from the proposed action, as well as to make a reasoned choice between alternatives. [citations omitted]

*County of Suffolk v. Secretary of Interior,* 562 F.2d 1368, 1375 (2d Cir. 1977), *cert. denied,* 434 U.S. 1064, 98 S.Ct. 1238, 55 L.Ed.2d 764 (1978).

Having reviewed the final EIS for the Connector and the record of this action in light of this "rule of reason," the court finds no merit in the challenge by plaintiffs to the adequacy of the final EIS. Defendants complied with the procedural requirements of NEPA. They circulated draft versions of the EIS to private organizations with interest and expertise in the environmental field. The comments of those or-

ganizations are reported in the final EIS. Defendants consulted with public agencies with related jurisdictions, and circulated draft versions of the EIS to such agencies. Their comments are also reported in the final EIS. *See* Final EIS at 219–285. Defendants publicized and conducted public hearings in the affected communities of East Hartford and Manchester. The views stated at those hearings are reported in the final EIS. *See* Final EIS at 215–217. Only after receiving and responding to these comments on the draft EIS, *see* Final EIS at 287–311, did defendants approve the final EIS for the Connector.

Having reviewed the substance of the final EIS, the court concludes that the document was compiled in good faith, and that it sets forth sufficient information to enable the Secretary to consider and balance the environmental factors involved, and to make a reasoned choice among alternatives.

The basic document is 311 pages long. With appendices, it totals almost 400 pages. It assumes three major project options, and compares their impact on eleven environmental elements. It considers several variations on the alternative of full construction as possible ways of avoiding the use of park land.

Because the project will link two existing pieces of highway, defendants had little choice in the selection of an appropriate highway "corridor" for the Connector. In 1971, the State of Connecticut had analyzed seven different corridors for a proposed expressway link between I–86 in Manchester and I–91 in Glastonbury, Connecticut. *See* Final EIS at 5, 8. This link, known as I–491, would have performed essentially the same function as the I–84/I–86 Connector. The state found none of those seven corridors to be feasible, however, and was forced to abandon its plans for the I–491 link between I–86 and I–91.

Thus the location of the highway "corridor" for the Connector was necessarily a given fact in this action. In compiling the final EIS, defendants considered three optional uses for that corridor. The first was a so-called "DO NOTHING" option, under which there would be "absolutely no work" done on the proposed project, and there would be no improvements made to local roads. Final EIS at 8. The second was a "NO BUILD/Improve existing transportation systems" option. It would provide for improvements to existing roadways, even though the new expressway section would not be built. These local improvements would include additional lanes where possible, special turning lanes, "signalization," and other changes to facilitate the traffic using local roads. *Id.* The third option was the "BUILD" option, which, as described in the final EIS at pages 4–5, included both improvements to the existing I–84 and I–86, and new construction of the connecting expressway. In preparing the final EIS, defendants performed several qualitative and quantitative studies. Their studies compared the effects of the three alternative proposals on the social and economic life of the communities surrounding the project; on air quality and noise levels; on the water and soil quality of the surrounding areas; on wildlife and vegetation; on historic, archeological, and paleontological characteristics of the area; and on aesthetic values. *See* Final EIS at (ii)–(iii).

The defendants' summary and assessment of these effects suggest that the EIS was compiled in good faith. Indeed, the final EIS highlights both the benefits and costs of each of the options, and makes clear to the decision-maker the values that will be either promoted or sacrificed by his choice among them. For example, after analyzing the effects of the Connector, the final EIS concludes that the Connector would benefit the economy and transportation features of the region by improving (1) traffic safety, (2) the accommodation of public transportation, (3) access to the Hartford metropolitan region, (4) economic growth, and (5) the potential for joint development. The final EIS recognizes, however, that the Connector is likely to cause some community disruption by taking public facilities and forcing some relocation of homes and commercial buildings. Final EIS at 212–213.

With respect to the environmental features which it studied, the final EIS notes that the Connector would actually reduce the noise problems which are now being created by the heavy traffic on local streets. Final EIS at 213. The final EIS concedes that the Connector will have some adverse environmental effects, however. In particular, the Connector will reduce the quantity, quality, and diversity of the vegetation and wildlife in the area; it will cause some erosion of soil; and it will lead to degradation of surface and ground water quality. Final EIS at 212–214. Finally, the EIS notes that the project will have little or no impact on archeology, paleontology, historic features, or the aesthetic quality of the area. Final EIS at 213–214. By isolating the impacts of the Connector in this way, the final EIS permits a decision-maker to weigh the costs and benefits of the project, as required by NEPA.

In challenging the adequacy of the final EIS, plaintiffs argue that the final EIS "fails to adequately analyze the scope of the [Connector] in light of the assumption that the other sections of I–84 may not be constructed[.]" Plaintiffs' Reply Brief at 1. They point out, for example, that defendants' estimate of the amount of daily traffic on I–84 and I–86 for the year 2000 assumes that construction of I–84 will be completed. If such construction does not proceed, they argue, there will be less than the projected amount of traffic in the area of the Connector, and thus less need for a Connector of the size currently being planned. *See* Plaintiffs Reply Brief at 2–4.[7]

Plaintiffs' argument is undermined, to a great extent, by their concession that there is an independent utility for some construction along the corridor of the Connector. To say that a roadway has "independent utility" is to conclude that "construction of [the] span is [not] dependent upon construction of the entire highway." *Citizens for Balanced Environment I*, 376 F.Supp. at 813. Thus a finding that a span has independent utility implies that an adequate consideration of the alternatives to it need not take into account the possibility that projected extensions of other highway segments either will, or will not, be completed.

Furthermore, plaintiffs forget that defendants' authorization of the Connector did not rest entirely, or even primarily, on their long-term projections of traffic patterns. Even before the plans for the Connector were drafted, there was a recognition of the need for a span of highway *like* the Connector. The proposed I–491 would have performed that function had it been built. The final EIS for the Connector makes clear that the absence of an expressway between the existing sections of interstate highway was causing abnormally heavy traffic on local streets, as of 1976, and that the Connector would improve that local traffic congestion. Moreover, the greatest traffic burden was being generated west of the site of the Connector. The traffic data for 1976 were compiled without assuming that any additional segments of I–84 would be constructed. Instead, in an analysis, the reasonableness of which plaintiffs do not dispute,[8] defendants assumed that the amount of daily traffic which had

7. In connection with their cross-motions for summary judgment, defendants have submitted an affidavit by Mr. Lembit Vahur, Transportation Director of Planning, Office of Inventory and Forecasting, Bureau of Planning and Research, Connecticut Department of Transportation. In this affidavit, Mr. Vahur represents that he has estimated the extent to which daily traffic in the area of the Connector is likely to grow even if the other sections of I–84 are not completed. Plaintiffs object strenuously to the court's considering any materials which have been prepared outside of the EIS process. Plaintiffs' Reply Brief at 8–10. In view of NEPA's policy that all relevant analyses be subjected to comment and review as part of an

EIS, the court has not considered the affidavit of Mr. Vahur in reviewing the record of this action. *See I–291 Why? Association v. Burns*, 517 F.2d 1077, 1081 (2d Cir. 1975).

8. Plaintiffs have questioned the validity of defendants' traffic forecasts with respect to proposed Sections I and II of I–84 in Eastern Connecticut. *See* Affidavit of Robert L. Morris, sworn to May 30, 1980. Plaintiffs have not challenged, however, either the defendants' computation of average daily traffic in the area of the Connector, as of 1974, or defendants' specific estimate of the increase in traffic in the area of the Connector between 1974 and 1976.

actually been calculated in 1974 would increase at a rate of 1½ per cent each year. On that basis, defendants estimated the amount of daily traffic on I–84 and I–86 in 1976, and concluded that, as of 1976, there was a need to build the Connector. Final EIS at 9. If one applies the defendants' estimate of the annual increase in traffic to successive years after 1976, it becomes clear that even if the other sections of I–84 are not built, daily traffic in the area of the Connector will increase significantly by the year 2000.

In sum, plaintiffs have argued that the final EIS for the Connector is inadequate because it rests upon the assumption that additional portions of I–84 will be constructed. This argument is not persuasive, however, because the EIS establishes that as early as 1976 there was a need to construct the Connector. Whether or not I–84 is eventually extended through eastern Connecticut, the undisputed estimates of increased traffic flow in the area of the Connector make clear that this need to construct the Connector can only increase by the year 2000.

NEPA does not bar the construction of highway projects simply because they may adversely affect the environment. It requires, however, that decision-makers consider any likely environmental impacts before authorizing construction. The final EIS is the vehicle for isolating and assessing environmental effects. Having reviewed the final EIS, the court concludes that the analysis undertaken by defendants in the course of compiling that document was sufficient to satisfy the requirements of NEPA.

### The Adequacy of the Section 4(f) Statement on the Use of Park Land

Because the Connector, as planned, would require the acquisition of park land, the federal defendants' authority to approve construction is limited by the identical terms of Section 138 of the Highway Act, 23 U.S.C. § 138, and Section 4(f) of the DOT Act, 49 U.S.C. § 1653(f). These statutes provide, in pertinent part, as follows:

[T]he Secretary shall not approve any program or project which requires the use of any publicly owned land from a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance as determined by the Federal, State, or local officials having jurisdiction thereof . . . unless (1) there is no feasible and prudent alternative to the use of such land, and (2) such program includes all possible planning to minimize harm to such park, recreational area, [or] wildlife and waterfowl refuge . . . .

"A feasible alternative route is one that is compatible with sound engineering[.]" *Monroe County Conservation Council, Inc. v. Volpe*, 472 F.2d 693, 700 (2d Cir. 1972), citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 411, 91 S.Ct. 814, 821, 28 L.Ed.2d 136 (1971). A "prudent" alternative is "one that does not present unique problems, that is, an alternative without truly unusual factors so that the cost or community disruption would reach extraordinary magnitudes." *Id.* In short, "a road must not take parkland [sic], unless a prudent person, concerned with the quality of the human environment, is convinced that there is no way to avoid doing .so." *Id.*

Two publicly-owned parks would be affected by the Connector. Veterans Memorial Park in East Hartford is a tract of fifty acres which lies directly south of the existing I–84/I–86 highway and just west of the East Hartford-Manchester town line. The park is used for a variety of recreational and social activities. Each year, about 3000 people use the park's nature trail and picnic and winter recreation areas. In 1975, about 24,000 people used the Veterans Memorial Clubhouse, a facility in the park which was designed for meetings, dances, receptions and parties. The proposed Connector would be built through the relatively undeveloped easterly end of the park. Construction would require about 27 acres of land, or 53.6% of the park's present area. This loss of acreage would remove from use a soapbox derby track, the park's picnic area and most of the nature trails. In addition, construction of the Connector would noticeably

increase noise levels in some sections of the park. Final EIS at 180. Air quality would not be harmed, however. Final EIS at 184.

Laurel Lake Marsh in Manchester is a 116 acre site, consisting largely of open and undeveloped marsh. There are no public facilities on the property. There are paths along the edges of the marsh, although the interior of the marsh is inaccessible by foot. The undisputed estimate of the final EIS is that no more than ten to fifteen persons per day, and no more than 500 persons per year, use the marsh for hiking, bird watching, canoeing, unauthorized hunting, and unauthorized motorbike riding. Final EIS at 192. Construction of the Connector would take a total of 9.6 acres of the marsh property, including 7.7 acres from the southwestern corner and western edge of the property at the East Hartford-Manchester town line, and 1.9 acres from the northwestern corner of the property south of the existing I–86 bridge over the Hockanum River. The land taken will include trails and paths along the western edge of the marsh and under the I–86 bridge. In addition, the Connector would eliminate vehicular access to the marsh from the west. Because vehicular access from the north has already been eliminated by the existing I–86, the Connector would severely restrict opportunities for hiking and recreational access to the marsh unless special joint development projects are begun. Final EIS at 196–198.

Plaintiffs argue that the Section 4(f) statement for the Connector fails to reflect "all possible planning" to minimize harm to the two parks. They contend that defendants should have considered a "scaled-down" version of the Connector, one which presumably would have involved less construction than the "BUILD" option, but more than the option of "NO BUILD/improve existing transportation systems." Plaintiffs give no indication of the scale of the project they propose, and provide no evidence that such a project could meet traffic needs while avoiding park land. *See* Plaintiffs' Reply Brief at 4–7.

■ Moreover, plaintiffs ignore the extent to which defendants have attempted to minimize harm to these properties. With respect to Veterans Memorial Park, defendants analyzed two options in addition to the "BUILD" option. The first option would shift the right-of-way for the Connector to the north. This realignment would have caused the loss of about sixty single family homes in the neighborhood of Chester Street and Arnold Drive in East Hartford. Because of the impact of this option on the surrounding neighborhood, East Hartford town officials found it to be unacceptable. In addition, if this northward option were to be constructed so as to avoid encroaching upon the western end of the park, the eastbound lanes of I–84 near the town line would have to be built along a sharp curve. The final EIS reports that because the highway configuration of this option would create driving hazards for cars traveling at expressway speeds, this option was unacceptable under the safety standards of the Connecticut Department of Transportation. Final EIS at 184–184a. Plaintiffs do not dispute this conclusion.

The second option other than the "BUILD" option would have involved a combination of multilevel viaduct and tunnel sections, thus greatly reducing the amount of park land taken. This option was found, however, to create a number of problems, including: (1) increased construction costs of at least thirty million dollars (*as determined in June 1974*); (2) high and continuing maintenance costs, including ventilation of the tunnel; (3) problems in maintaining highway safety through an extended tunnel; (4) unacceptably sharp curves for the eastbound lanes of I–84, similar to those created by the first optional plan; (5) difficulties in maintaining adequate traffic flows during construction; and (6) increased noise levels on the viaduct sections. Final EIS at 184. In July 1974, the three plans were submitted to East Hartford officials. In a letter of July 30, 1974, they agreed that the "BUILD" option was the most feasible. Final EIS at 184–184a, 203.

In this letter, the town made its approval of the Connector contingent upon "the effective exchange of a sufficient amount of land to the southwest of Veterans Memorial Park" to replace land lost to the highway. Final EIS at 203. In the final EIS, defendants represent that there is a parcel of equivalent acreage, now owned by the state and contiguous to the park, which will be available for the required exchange. That parcel is apparently suitable for development as a park and provides access to Silver Lane, a major town artery. Final EIS at 185. Upon this representation, the Mayor of East Hartford stated, in his letter of July 30, 1974, that the anticipated impact of the Connector was acceptable to local officials. Final EIS at 203. FHWA regulations contemplate such exchanges of land as an acceptable means of planning to minimize harm to park land. 23 C.F.R. § 771.19(k)(1).

Between 1970 and 1974, defendants considered six options other than the taking of property from Laurel Lake Marsh. The effects of each option are described and compared in the final EIS. Final EIS at 198–201. Defendants found the "BUILD" option to be the most useful of these and recommended it to officials of the Town of Manchester. Final EIS at 201. In November 1974, these local officials endorsed that option. Final EIS at 199.

In a further effort to minimize harm to the marsh, the town of Manchester intends to exchange the 9.6 acres of the marsh which would be needed for the Connector right-of-way for a parcel of about 12.9 acres, owned by the State of Connecticut, adjoining the northeast corner of the Laurel Lake Marsh property. In the final EIS, defendants represent that state and local officials will undertake a series of measures to develop the marsh property to increase public access and recreational opportunities. These include the creation of roadway access to the property from the south, and the development of bikeways and footpaths

along the edges of the marsh. Final EIS at 201–202. Upon these representations, officials of the town of Manchester restated their support for the Connector project in July 1976. Final EIS at 208–209. FHWA regulations contemplate such improvements to previously undeveloped property as an acceptable means of planning to minimize harm to park lands. 23 C.F.R. § 771.-19(k)(2).

Although defendants did not analyze the "scaled-down" Connector which plaintiffs hypothesize, they did consider a number of ways to avoid taking park land, and then committed themselves to plans to minimize the harm to those parks. Because of the permanent placement of existing highway segments, the number of the available locations for the Connector is limited. In view of the options which defendants assessed, and were forced to reject, the court finds that there were no "feasible" or "prudent" alternatives to the taking of these park lands.[9] Upon the stated representations of defendants that they will undertake to replace lost properties, the court finds that they have performed the planning to minimize harm to park land which is required by law. Plaintiffs' challenge to the adequacy of the Section 4(f) statement is, therefore, without merit.

### Conclusion

When a court reviews agency action under NEPA and the DOT Act, its scrutiny of the facts is to be searching, but its standard of review is narrow. *Citizens to Preserve Overton Park, Inc. v. Volpe, supra,* 401 U.S. at 416, 91 S.Ct. at 823. The issue is not whether, in the first instance, the court would have reached the same decision as the agency. The issue is whether, in reaching its decision, the agency followed the procedures imposed by law. *See Vermont Yankee Nuclear Power Corp. v. NRDC, supra,* 435 U.S. at 558, 98 S.Ct. at 1219.

---

**9.** In a letter of April 18, 1977, from Deputy Assistant Secretary of the Interior, Stanley K. Koremus, to defendant Altobelli, FHWA Division Administrator for Connecticut, the Department of the Interior stated:

> We concur that there is no feasible and prudent alternative to the taking of parkland [sic] from Veterans Memorial Park and the Laurel Lake Marsh.
>
> *See* Final EIS at 258.

Defendants propose to place the Connector in a dense and growing metropolitan region, already intersected by major highways. Defendants intend to build the Connector in order to relieve some of the traffic congestion which has been created by metropolitan growth. Because of the long-standing placement of the roadways which the Connector will link, the options of the defendants were limited. Because of the density of the area, a certain amount of disruption is inevitable. In short, *any* option which the defendants had chosen would, no doubt, have provoked opposition and a demand for judicial review.

 Highway construction in an urban setting necessarily involves disruptions. For that reason, decisions on the placement of highway construction are to be left to expert administrators, acting under applicable law with the advice and oversight of elected officials drawn from the affected communities. Congress has defined the factors which an agency must consider in reaching its decision. Once a federal court has determined that these factors have been considered and that the agency's decision is reasonable in light of the circumstances, the court's task is done; a court is neither authorized nor well equipped to substitute its judgment for that of expert administrative agencies.

The I–84/I–86 Connector has been more than seven years in planning. Within that time, and within the range of conceivable options open to them, defendants have considered a number of plans. In analyzing those plans, they have consulted with interested members of the public, and with local, state, and federal officials. Having reviewed the record, the court concludes that, in their methods of consultation and analysis, defendants complied fully with applicable procedures. The court further concludes that, in preparing the final EIS for the Connector, which records the results of both that consultation and that analysis, defendants acted in good faith. The final EIS sets forth sufficient information to enable the relevant decision-maker to consider fully the environmental factors involved in constructing the Connector, as well as to balance the risks of environmental harm against the benefits of construction, and finally, to make a reasoned choice between alternatives. Accordingly, defendants have satisfied the obligations imposed upon them by applicable law. *See Citizens for Balanced Environment II, supra,* at 460–461.

Plaintiff's motion for summary judgment with respect to the I–84/I–86 Connector is denied; defendants' cross-motions for summary judgment are granted.

On November 19, 1980, this court ordered defendants not to acquire rights-of-way for the Connector or to commence construction pending this court's consideration of the issues raised by the parties in their cross-motions for summary judgment on issues concerning the Connector. The court now having ruled on those cross-motions, that order is hereby dissolved.

It is so ordered.