[No. D015851. Fourth Dist., Div. One. Oct. 23, 1992.]

DEL MAR TERRACE CONSERVANCY, INC., Plaintiff and Appellant, v. CITY COUNCIL OF THE CITY OF SAN DIEGO et al., Defendants and Respondents.

**COUNSEL**

Mulvaney, Kahan & Barry, John H. Reaves, Lawrence Kahan, Diane M. Racicot and Charles F. Bethel for Plaintiff and Appellant.

John W. Witt, City Attorney, C. Alan Sumption, Chief Deputy City Attorney, Leslie J. Girard, Deputy City Attorney, Meyer, Peterson & Joseph and Jeffrey A. Joseph for Defendants and Respondents.

**OPINION**

**HUFFMAN, J.**—Del Mar Terrace Conservancy, Inc. (DMTC), a nonprofit environmental and conservation organization, appeals the judgment of the superior court denying its petition for writ of mandate. DMTC based its petition on the theory that the City of San Diego (the City), through its city council, abused its discretion when it certified as complete the final environmental impact report (EIR) prepared on a 1.8-mile highway project, State Route (SR) 56 West. The California Department of Transportation (Caltrans) is a cosponsor of the SR 56 West project and is an additional respondent in these proceedings.

Relying both upon the administrative record that was before the city council at the time of the decision, and upon evidence extraneous to the record which the trial court declined to consider, DMTC argues on appeal that the certification of the EIR was made without the support of substantial evidence. (Pub. Resources Code, §§ 21168, 21168.5.)[1] As a threshold matter, DMTC contends the trial court erroneously treated the matter as an administrative mandamus proceeding, whereas ordinary mandamus would have been more appropriate and would have permitted the extraneous evidence to be considered. DMTC goes on to make substantive arguments about the

---

[1]All statutory references are to the Public Resources Code unless otherwise specified.

alleged inadequacy of the EIR, as follows: (1) the SR 56 West project represents an impermissible segmentation of the highway project when the whole of a proposed nine-mile SR 56 project is considered; (2) the EIR inadequately analyzes the cumulative impacts of the project; (3) feasible alternatives to the project are inadequately discussed in the EIR; and (4) the mitigation measures listed in the EIR are inaccurate, deficient and therefore inadequate.

We agree with DMTC that this petition properly sounded in ordinary mandamus because of the quasi-legislative nature of the City's conduct when it certified the EIR and amended the applicable land use plans in order to enable construction of the SR 56 West project. However, our review of the record discloses that this error by the trial court was not prejudicial. (§ 21005.) Judicial review of the adequacy of this EIR, conducted according to the same substantial evidence standard as used by the trial court, discloses that the EIR is sufficient as an informational document and that the decision of the city council is supported by substantial evidence. (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564 [276 Cal.Rptr. 410, 801 P.2d 1161].) We affirm the judgment of the trial court denying the petition for writ of mandate.

## Factual and Procedural Background

We set forth the general background of this dispute, reserving the more technical facts for our discussion of DMTC's substantive challenges to the adequacy of the EIR under the California Environmental Quality Act (CEQA) (§ 21000 et seq.). Long-range planning for a proposed state route, SR 56, began in 1959 when the concept of an east-west state highway, extending from north of La Jolla to SR 67, east of Poway, was adopted as part of the state highway system. (Sts. & Hy. Code, §§ 300, 356.)[2] The City had included a proposed SR 56 through its jurisdiction, although with no particular alignment, in the circulation element of its 1967 general plan, and in community plans for North City West and Sorrento Hills, dated 1975 and 1983, respectively. A proposed SR 56 has been included in other regional land use plans by the City and other agencies since 1983. The City enacted a transportation policy on May 13, 1985, which specified the development of an adequate transportation system for the northern portions of the City, including SR 56. The City and Caltrans (collectively sometimes referred to here as Respondents) have generally indicated in these plans that SR 56 is to connect Interstate 5 (I-5) and Interstate 15 (I-15).

---

[2]*Streets and Highways Code section 356*, found in article 3, "The State Highway Routes," and enacted in 1963, states: "Route 56 is from Route 5 north of La Jolla to Route 67."

The passage of two initiatives by the City's electorate affected land use planning concerning the proposed SR 56. In 1985, Proposition A, a managed growth initiative, was passed, designating a "Future Urbanizing Area" (FUA), that would be off limits to intensive development through 1995 without a citywide vote to approve such development. This FUA bisects SR 56 and runs for approximately three to four miles from east to west in the Carmel Valley area. Then, in 1987, a different Proposition A, a transportation sales tax, was passed to create funding for designated regional transportation needs, including SR 56, but only outside the FUA zone. Around the time that the transportation sales tax was passed, Senate Bill No. 140 was passed to provide for matching state funds if a contract were awarded on the SR 56 project by June of 1991.

Due to the operation of these initiatives, there was no land use plan for the FUA. Thus, the City and Caltrans, as co-applicants for this project, could not commit to an alignment for SR 56 through that area, nor could they plan for onramps, offramps, their locations or configurations. Because of the effect of the designation of the FUA, the City and Caltrans instead developed plans for an SR 56 East project from the interior of Rancho Penasquitos to I-15, and for an SR 56 West project to help motorists reach I-5 from the interior of North City West. These two projects were located at opposite ends of the FUA zone.

In addition to creating the two plans for the SR 56 West and SR 56 East projects, the City and Caltrans discussed for planning purposes the entirety of the SR 56 corridor. The record shows SR 56 West was designated as phase II and SR 56 East was designated as phase IV of an overall scheme. The remaining three phases were the I-5 widening project to connect SR 56 to I-5, the area in the FUA, and the portion from I-15 eastward to SR 67. Originally, beginning in December 1987, Caltrans had planned to file a negative declaration for purposes of complying with CEQA (§ 21064), but it eventually prepared separate draft EIR's for both the SR 56 West and SR 56 East projects.[3]

Focusing specifically on the SR 56 West project: its EIR describes the project as converting a 1.8-mile section of Carmel Valley Road to a four-lane freeway, with expansion possibilities to six lanes. This project will commence .6 miles east of I-5 (not affecting the existing access from Carmel Valley Road to I-5, a different "phase"), and run to a point .5 miles east of an intersection with Carmel Country Road. The record shows that this highway will be built along existing Carmel Valley Road; that alignment is consistent

---

[3]There has been no litigation over the adequacy of the EIR for the SR 56 East project.

with the City's general plan and the various community plans in the area, and alternative alignments were evaluated as being more environmentally damaging and more costly due to steep grades outside the valley. An alignment further south would also have conflicted with the I-5/I-805 interchange which could have caused hazardous weaving movements by motorists. Traffic projections prepared by the San Diego Association of Governments (SANDAG) indicate extremely crowded traffic conditions will exist in the Carmel Valley area of I-5 by the year 2010.[4] The projections conclude that traffic will continue to increase even if the North City West community is not entirely built out and SR 56 is not connected to I-15.

In addition to the highway route alignment described in the draft EIR for the SR 56 West project, the project includes an extensive drainage and sediment control channel portion known as the Carmel Valley Restoration and Enhancement Project (CVREP). CVREP was developed when the California Coastal Commission conditionally accepted the design and construction of SR 56 West in a 1985 amendment to the North City West Local Coastal Program, provided that local waterways be protected. CVREP, to be created on the south wide of SR 56 West, will consist of a heavily vegetated, natural-appearing channel with riparian vegetation and an adjacent 50-foot landscaped greenbelt containing an equestrian trail, a marked bicycle lane, and a pedestrian path. CVREP includes a five-year monitoring and maintenance program, to be extended for the life of the project, if necessary.[5]

The SR 56 West draft EIR was submitted for public notice and comment in June 1989. The stated objectives of the SR 56 West project included accommodation of existing and projected increases in traffic congestion in North City West, and the preparation of CVREP in compliance with the requirements of the North City West Local Coastal Program. Public workshops and hearings before the City's transportation and land use committee and the planning commission were conducted. In response to the notification of completion of the draft EIR, voluminous comments were received, considered, and responded to in the final EIR. DMTC participated actively in all stages of the hearings on SR 56 West and submitted its considerations in a letter, to which the final EIR extensively responds.[6] In April 1990, the City's planning commission voted not to certify the SR 56 West EIR, based on its

[4]Under present traffic conditions, the two onramps from Carmel Valley Road to I-5 are approaching near capacity.

[5]Pursuant to a request for judicial notice filed by respondents (Evid. Code, § 459, subd. (a)), we note that the Coastal Commission has now approved CVREP and the proposed alignment for SR 56 West.

[6]Also in 1989, the City and Caltrans circulated the draft EIR for the SR 56 East project and a federal environmental impact statement for the I-5 widening project.

concern that the discussion of alternatives was inadequate, the wetlands impacts were unnecessary, and the project had been "piecemealed."

Acting as the lead agency for certification of the EIR, the city council scheduled the matter for public hearing on April 24, 1990. At the hearing, DMTC presented its proposed "Watson alternative," a more southerly route for SR 56 West. In response to information received at the hearing, the city council continued the matter for two weeks so that council member Wolf-sheimer could personally inspect the Watson alternative by Jeep. When the hearing resumed on May 8, 1990, the Watson alternative was rejected because it involved condemning already developed properties and potential danger to vernal pools. By resolution, the city council certified the final EIR as adequate, complete, and in compliance with CEQA and the guidelines. The city council also adopted related CEQA findings and a mitigation monitoring program. In order to authorize the construction of SR 56 West and CVREP, the council also made related land use decisions, including amendments to the City's progress guide and general plan, several commu-nity plans and precise plans, and the North City Local Coastal Program Land Use Plan. The City's approval of the EIR and the SR 56 West project in Resolution No. R-275679 was conditioned by the following language: "Al-though the proposal is too speculative to analyze from an environmental standpoint at this time, in the event that SR-56 West is extended through the City's Future Urbanizing Area to connect I-5 to I-15, Caltrans agrees to provide and construct northbound freeway connectors at the junction of I-5 and SR-56 within three years after completion of the possible, future con-nection of SR-56 through the Future Urbanizing Are[a] to I-15."

DMTC promptly filed its petition for writ of mandate challenging the City's decision to certify the EIR. The City and Caltrans, as respondents, were requested to prepare the record of proceedings relating to the subject matter of the petition. (§ 21167.6.) A 12-volume record of proceedings was duly prepared and supplied for DMTC's review. Discovery began shortly after the petition was filed, and the petition was set for hearing and then continued until February 15, 1991. In support of its supplemental and reply memoranda, DMTC lodged five volumes of appendices with the trial court, including documents DMTC claimed were improperly omitted from the record of proceedings prepared by the City.[7] The documents contained in these appendices included SR 56 route concept and project reports prepared by Caltrans, a 1988 Caltrans Route 56 growth study, a suggested alternate alignment study report, confidential memoranda, and SANDAG's regional

---

[7] In its opening brief, DMTC admits, as it did to the trial court, that much of the material contained in these appendices duplicated documents found in the certified record.

transportation plans. Planning documents for the Sorrento Hills community (site of a proposed alternative alignment for SR 56) were included in the appendices, because the EIR referred to them but failed to incorporate their full text.

In addition to its appendices, DMTC filed its supplemental joint disposition statement listing witnesses, including the City's mayor and the entire city council, top level officials of Caltrans, and numerous staff members. The City responded with a similar designation of witnesses.

In response to DMTC's filings, the City and Caltrans brought two motions *in limine* on grounds (1) the underlying agency actions were quasi-adjudicatory and thus review should be limited to the record of proceedings, and (2) the proposed testimony would evidently be improperly offered to show the subjective reasoning processes of the decision maker. Granting the motions, the trial court ruled that the evidence not contained in the administrative record would be excluded, on the theory that "[t]he acts approving the environmental impact report are quasi-judicial and no rule or standard for future application has been promulgated." Review was to be conducted pursuant to the administrative mandamus section of CEQA, section 21168 (incorporating by reference Code Civ. Proc., § 1094.5). The court also noted that no exception applied to allow expansion of the record (Code Civ. Proc., § 1094.5, subd. (e)), in that DMTC had failed to make any showing of reasonable diligence in the failure to present the evidence previously. Accordingly, the motion to exclude testimony of the subjective reasoning of the decision makers was also granted. This ruling was confirmed at oral argument.

Shortly thereafter, DMTC applied ex parte to the trial court for an order allowing augmentation of the record or, alternatively, staying the proceedings pending a petition to this appellate court. The motion for augmentation was denied and the stay was granted. DMTC petitioned this court for writ of mandate to overturn the trial court's evidentiary rulings. (*Del Mar Terrace Conservancy, Inc.* v. *Superior Court* (May 15, 1991). D014175 [nonpub. opn.] (hereafter D014175).) On May 15, 1991, we denied the petition on the ground that there was an adequate remedy by appeal.[8]

Back at the trial court, DMTC moved to amend its petition to claim not all relevant documents had been considered, in order to conform to proof based

---

[8]Pursuant to the respondents' request, this court takes judicial notice of the writ proceedings in D014175, as well as a companion writ proceeding, *Del Mar Terrace Conservancy, Inc.* v. *City Council of San Diego et al.* (July 24, 1992) D017111 [nonpub. opn.] (hereafter D017111). (Evid. Code, § 459, subd. (a).)

upon alleged admissions made by respondents in their appellate papers in the writ proceedings. These admissions were that Respondents had produced discovery for DMTC which consisted of City and Caltrans staff file documents which had not been presented to or considered by the city council when it certified the EIR. The motion was denied. DMTC also filed a request for judicial notice in support of its petition, lodging two volumes of documents not included in the record of proceedings. At trial, the court declined to take judicial notice as requested of the extraneous evidence.

The hearing on the petition took place in September 1991 with each side presenting oral argument and directing the trial court's attention to those portions of the record of proceedings in support of their respective positions. The trial court ruled that the issue raised by the petition was whether substantial evidence existed to support the city council's decision. Judgment was entered denying the petition on October 1, 1991. DMTC duly appealed. In related writ proceedings (*Del Mar Terrace Conservancy, Inc.* v. *City Council of San Diego* (May 19, 1992) D016666 [nonpub. opn.]), this court denied DMTC's petition for writ of supersedeas and request for a stay pending appeal, but imposed a strict briefing schedule.[9]

## DISCUSSION

Our first area of inquiry will be whether the trial court correctly concluded that this proceeding sounded in administrative mandamus (§ 21168; Code Civ. Proc., § 1094.5), as opposed to ordinary mandamus (§ 21168.5; Code Civ. Proc., § 1085). As we will explain, we conclude the trial court erroneously proceeded under administrative mandamus, in light of the fact that the dominant concern of the City's actions which were challenged by the petition for writ of mandate was quasi-legislative, as opposed to quasi-judicial. (See *City of Rancho Palos Verdes* v. *City Council* (1976) 59 Cal.App.3d 869, 883-885 [129 Cal.Rptr. 173].) Regardless of the type of mandate proceeding, however, the same deferential standard of review applies, "i.e., whether substantial evidence supports the agency's determination. [Citations.]" (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392, fn. 5 [253 Cal.Rptr. 426, 764 P.2d 278] (hereafter *Laurel Heights*).) The importance of the distinction between the two types of mandate proceedings, therefore, lies in the rule that in ordinary mandamus conducted under section 21168.5 and Code of Civil Procedure section 1085, the trial court is allowed to receive evidence outside the administrative record. (*Sierra Club* v. *Gilroy City Council* (1990) 222

---

[9]In the recent writ proceedings in D017111, this court also denied a petition for writ of supersedeas which would have prevented construction pending appeal.

Cal.App.3d 30, 40 [271 Cal.Rptr. 393].) However, that procedure is not available under section 21168, incorporating Code of Civil Procedure section 1094.5. (222 Cal.App.3d at p. 40.)

Notwithstanding our preliminary determination that this action was properly one in ordinary mandamus (pt. I, *post*), we shall defer our consideration of whether the trial court's refusal to allow evidence to be brought in from outside the administrative record prejudiced DMTC until after we have addressed DMTC's main criticisms of the adequacy of the EIR in this case. Specifically, we shall discuss (in pts. II and III, *post*) DMTC's arguments that the SR 56 West project represents an improper segmentation of the overall SR 56 project, and shall consider the issues of whether the EIR in this case adequately addressed the topics of cumulative impacts, feasible alternatives, and potential mitigation measures. In conclusion (pt. IV, *post*), we shall return to the issue of the appropriate scope of the record in this case.

I

*Type of Mandate Proceedings*

In its petition for writ of mandate, DMTC relied on section 21168.5 and Code of Civil Procedure section 1085 to allege that the City and Caltrans violated CEQA by certifying the EIR and approving the plan amendments and the SR 56 West route; these actions it characterized as quasi-legislative, deserving of judicial review in ordinary mandamus. In the alternative, DMTC pled it was entitled to review under section 21168 by way of administrative mandamus under Code of Civil Procedure section 1094.5. The petition alleges abuse of discretion by Respondents on the basis of lack of substantial evidence to support their decisions.[10] The relief it sought was the issuance of a peremptory writ of mandate to set aside the decision to approve the project as defined in the EIR and resolutions, and to require the City and Caltrans to prepare an EIR that complies with CEQA.

The trial court was called upon to decide which type of mandamus was proper in this proceeding when respondents filed their motions *in limine* to exclude evidence not contained in the administrative record and to exclude testimony of the subjective reasoning of the decision makers. In granting these motions, the trial court found: "The acts approving the [EIR] are

---

[10]Although the petition also makes an allegation that Respondents failed to comply with the procedural requirements of CEQA, DMTC has not seriously pursued this theory on appeal, relying chiefly on its claim of lack of substantial evidence to support the decision. (§§ 21168, 21168.5.)

quasi-judicial and no rule or standard for future application has been promulgated. Review is to be conducted pursuant to Section 21168. Petitioners have failed to make any showing of reasonable diligence in the failure to present the evidence previously."

At oral argument on the motions, the trial court commented that no special showing had been made entitling DMTC to present nonrecord evidence. (Code Civ. Proc., § 1094.5, subd. (e).) In reaching its conclusion that the action of the City in certifying the EIR was quasi-judicial, the trial court relied in part on an ordinance enacting a permanent rule of the council, rule 9, providing for debate and testimony on a resolution. (San Diego Mun. Ord., § 22.0101 [of which we are requested to take judicial notice pursuant to Evid. Code, § 452, subd. (b)].) Because a hearing was required on the resolutions containing the certification of the EIR and the amendment of the applicable plans, the court found that under Code of Civil Procedure section 1094.5, subdivision (c), a hearing had been required and thus administrative mandamus was the proper form of proceeding. Accordingly, the evidence to be presented at trial was confined to that found in the administrative record (here, the record of proceedings).

To review the trial court's procedural ruling, we first note that the issue is not clear cut whether a lead agency's decision to certify an EIR and proceed with a project constitutes quasi-legislative or quasi-judicial action. In *City of Rancho Palos Verdes* v. *City Council, supra,* 59 Cal.App.3d 883-885, the court established the rule that "the presently applicable test of adjudicatory or legislative character of local governmental action which possesses characteristics of both is the dominant concern of the action taken." (*Id.* at p. 885.) In this case, the city council passed two resolutions to implement the project. In R-275678, the city council certified the EIR as complete and adopted attached findings regarding mitigation, feasibility of project alternatives, and a mitigation monitoring and reporting program. (§ 21081.) In resolution No. R-275679, the city council made specific changes to several neighborhood precise plans and community plans, as well as other planning devices and the City's progress guide and general plan, conditioned upon certain provisions: i.e., an agreement by Caltrans to provide and construct northbound freeway connectors at a future junction of I-5 and SR 56 within three years after completion of a possible, future connection of SR 56 through the future urbanizing area to I-15. Caltrans also agreed to secure the necessary rights of way and study a light rail alignment program. Approval of the changes in these plans was also conditioned upon adoption of the CVREP and unconditional approval by the Coastal Commission of the amendments.

The purpose of all the plan amendments accomplished by the two resolutions was to enable construction of the road in those various communities. Location of a roadway was found to be primarily legislative in character in *Wheelright* v. *County of Marin* (1970) 2 Cal.3d 448, 458 [85 Cal.Rptr. 809, 467 P.2d 537], and *Sinclair* v. *State of California* (1961) 194 Cal.App.2d 397, 406-407 [15 Cal.Rptr. 493]. In *Oceanside Marina Towers Assn.* v. *Oceanside Community Development Com.* (1986) 187 Cal.App.3d 735, 745-746 [231 Cal.Rptr. 910], this court enunciated the principle "that decisions of public entities as to the location of public improvements are legislative in character." (*Id.* at p. 745.) We explained, "The rationale underlying these cases is that a quasi-adjudicative land use determination is based largely if not exclusively on facts peculiar to the affected locale. In contrast, however, the considerations relevant to the siting of a public improvement are not so limited. To be sure, one significant factor to be considered by the public entity is the effect the improvement will have on surrounding properties. But the entity must then balance those effects against the benefits accruing to the public generally as a result of the improvement." (*Id.* at p. 746; see also *Langsam* v. *City of Sausalito* (1987) 190 Cal.App.3d 871, 879-881 [235 Cal.Rptr. 672].)

It is not inconsistent with the nature of quasi-legislative action that an agency holds hearings and takes evidence in reaching its decision on the matter. (*Santa Ana Tustin Community Hospital* v. *Board of Supervisors* (1982) 127 Cal.App.3d 644, 650 [179 Cal.Rptr. 620]; *Patterson* v. *Central Coast Regional Com.* (1976) 58 Cal.App.3d 833, 840-841 [130 Cal.Rptr. 169].) "There is no provision in the CEQA itself which specifically requires a public hearing in connection with the preparation and filing of an EIR. [Citation.]" (*Lightweight Processing Co.* v. *County of Ventura* (1982) 133 Cal.App.3d 1042, 1047 [184 Cal.Rptr. 479]; see also Remy et al., Guide to the Cal. Environmental Quality Act (CEQA) (6th ed. 1992) ch. 8, § N, pp. 145-146.)

In this case, permanent rule 9 of the city council (San Diego Mun. Ord., § 22.0101), setting forth a procedure for public hearing on resolutions, does not convert the primarily quasi-legislative character of the subject resolutions into a quasi-adjudicative land use determination that is based on facts peculiar to the affected locale. (*Oceanside Marina Towers Assn.* v. *Oceanside Community Development Com., supra*, 187 Cal.App.3d at p. 746.) Neither do the provisions of the CEQA guidelines (Cal. Code Regs., tit. 14, § 15000 et seq. (Guidelines)), sections 15089 through 15092, dealing with the preparation, certification, findings, and approval concerning a final EIR, specifically set forth any hearing requirement. Under Guidelines section 15087, subdivision (g), public hearings may be conducted on environmental documents,

such as draft EIR's, and are encouraged but not required as an element of the CEQA process.

For these reasons, we conclude that despite the fact that hearings were conducted on the resolutions in this matter, the actions taken by the city council in certifying the EIR and approving the various plan amendments necessary to authorize construction of the SR 56 West project had as their "dominant concern" matters which have traditionally been considered to be quasi-legislative in character. (*City of Rancho Palos Verdes* v. *City Council*, *supra*, 59 Cal.App.3d 883-885.) The proper form of judicial review of the city council's action accordingly lay in traditional mandamus under section 21168.5 and Code of Civil Procedure section 1085. The trial court would therefore have been justified in receiving additional evidence outside the administrative record prepared of the city council's proceedings concerning the EIR. However, before we discuss the opportunities which the trial court had to consider such additional evidence, and the nature of that evidence (see pt. IV, *post*), we shall proceed to a consideration of the substantive claims made by DMTC against the adequacy of the EIR.[11]

II

*Was the Project Improperly Segmented?*

A

*Standard of Appellate Review*

DMTC's claim that the SR 56 West project represents an improper segmentation of a larger project, the SR 56 corridor, is primarily an attack on the adequacy of the project description and, secondarily, an attack on the sufficiency of the analysis of the project in the EIR. To analyze these claims, we first reiterate the proper standard of judicial review in reviewing the City's actions under CEQA. The reviewing court inquires whether substantial evidence supports the agency's determination. (*Laurel Heights, supra*, 47 Cal.3d 376, 392, fn. 5; Guidelines, §§ 15091 (b), 15384 (a).) ■ "The court's inquiry in an action to set aside an agency's decision under CEQA extends only to whether the agency committed a prejudicial abuse of discretion. In this regard, although a court does not pass upon the correctness of an

---

[11]By separate application, DMTC has requested this court to take judicial notice in support of its reply brief of a public notice and draft EIR regarding the City's "North City Future Urbanizing Framework Plan" and its related appendices. This draft EIR has been prepared for the FUA, and is designated by DMTC as the "FUA dEIR." We shall discuss this new request for judicial notice as necessary in part IV, *post*. (Evid. Code, §§ 452, subd. (b), 459; Code Civ. Proc., § 909.)

EIR's environmental conclusions, it does determine whether the EIR is sufficient as an informational document. [Citations.]

"。 . . . . . . . . . . . . . . . . . . . . . . . .

"CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive. [Citation.] . . . The absence of information in an EIR . . . does not per se constitute a prejudicial abuse of discretion. [Section 21005.] *A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.* [Citation.]" (*Kings County Farm Bureau* v. *City of Hanford* (1990) 221 Cal.App.3d 692, 711-712 [270 Cal.Rptr. 650] (hereafter *Kings County*), italics added.)

We are further instructed by the Supreme Court in *Laurel Heights, supra,* 47 Cal.3d 376, 408 to consider the evidence as a whole. Although a reviewing court is required to pay particular attention to detail, it "is not to review each item of evidence in the record with such exactitude that the court loses sight of the rule that the evidence must be considered as a whole." (*Ibid.*) ■ Regarding the adequacy of a project description, we apply this standard: "An accurate, stable and finite description of a project is basic to an informative and legally sufficient EIR. [Citation.] A curtailed or distorted description of the project may 'stultify the objectives of the reporting process.' [Citation.] Basic to environmental review is that it occur early enough in the planning stages of the project to enable environmental concerns to influence the project's program and design, yet late enough to provide meaningful information for environmental assessment. [Citation.] However, 'where future development is unspecified and uncertain, no purpose can be served by requiring an EIR to engage in sheer speculation as to future environmental consequences.' [Citation.]" (*Kings County, supra,* 221 Cal.App.3d 692, 738.)

■ Even though an EIR need not include speculation about future environmental consequences of a project, it is settled under *Laurel Heights, supra,* 47 Cal.3d 376, 394-396 that: "[A]n EIR must include an analysis of the environmental effects of future expansion or other action if: (1) it is a reasonably foreseeable consequence of the initial project; and (2) the future expansion or action will be significant in that it will likely change the scope or nature of the initial project or its environmental effect. Absent these two circumstances, the future expansion need not be considered in the EIR for the proposed project. Of course, if the future action is not considered at that

time, it will have to be discussed in a subsequent EIR before the future action can be approved under CEQA." (*Id.* at p. 396.)

Under this *Laurel Heights* standard, "*the facts of each case* will determine whether and to what extent an EIR must analyze future expansion or other action." (*Laurel Heights, supra,* 47 Cal.3d at p. 396, italics added.) Moreover, in *Laurel Heights* at page 398, the Supreme Court seemed to require discussion " 'in at least general terms' " of future activity in connection with a project, even if it is contingent on the happening of certain occurrences.

The facts of the case in *Laurel Heights, supra,* 47 Cal.3d 376, required the project proponent to analyze future expansion and other such action in its EIR because there was "telling evidence" that it had either made decisions or had formulated reasonably definite proposals as to expanded future use of a specific building and site. Thus, the future expansion and the general types of future activity at the facility were found to be reasonably foreseeable, and had to be discussed in the EIR. (*Id.* at pp. 396-397.)

Those facts in *Laurel Heights, supra,* 47 Cal.3d 376 of current and future uses of a particular building at a particular location are to be distinguished from the facts in the case before us involving a project constituting 1.8 miles of state highway, to be developed separately from other adjoining segments of the highway. In particular, the record of the proceedings shows that beginning in 1988, the overall SR 56 project was discussed as constituting five phases: the two end phases of freeway connections for I-5 and I-15/SR 67, respectively; the 56 West and 56 East projects; and the intervening zone of the four miles of the FUA, which was separately controlled by the terms of the Proposition A growth management initiative. Contemporaneously prepared with the planning and environmental documents for SR 56 West were the City's and Caltrans's related plans for the separate freeway segment, SR 56 East, as well as the two end segments of freeway connections to I-5 and I-15/SR 67. However, because of the uncertainty of whether and when the electorate will approve development in the FUA, the case before us is distinguishable from the facts in *Laurel Heights, supra,* where the court stated: "This is not the type of situation where it is unclear as to whether a parcel of land will be developed or as to whether activity will commence." (*Id.* at p. 396.)

We believe this is such a case, unlike *Laurel Heights,* since it is unclear whether and when the SR 56 West project will be allowed to be connected to the SR 56 East project and their respective freeway connections, because of

the uncertainties about development in the FUA.[12] However, before we discuss the adequacy of the EIR's analysis of the reasonably foreseeable future activity connected with the project, we are required to evaluate the appropriateness of the standard applied by the trial court for reviewing the sufficiency of the project description in light of DMTC's "segmentation" claim.

*B*

*Federal Standard re: Segmentation of Road Projects*

The trial court advised counsel at the outset of the hearing on the petition that it would use the federal rule articulated in *Daly* v. *Volpe* (3d Cir. 1975) 514 F.2d 1106, 1109-1110, for analysis of DMTC's segmentation claim, and explained: "As far as the piecemealing argument is concerned, I will use the rule articulated in *Daly versus Volpe*, which I don't think is at all in opposition to *Laurel Heights*. I think *Laurel Heights* is general. *Daly versus Volpe* is specific to roads." ■ In thus relying on the analysis and rule set forth in *Daly* v. *Volpe, supra*, 514 F.2d 1106, the trial court acted consistently with the direction of our Supreme Court in *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190, 201 [132 Cal.Rptr. 377, 553 P.2d 537], that since CEQA was modeled on the Natural Environmental Policy Act (NEPA) (42 U.S.C. § 4321 et seq.), California courts have consistently treated judicial and administrative interpretation of the latter enactment as persuasive authority in interpreting CEQA.

■ In *Daly* v. *Volpe, supra*, 514 F.2d 1106, decided under NEPA, the Court of Appeals set forth four criteria for evaluating the sufficiency of an environmental review document which covers a portion of a larger roadway. First, recognizing that "[p]iecemealing proposed highway improvements in separate environmental statements should be avoided," (*id.* at p. 1109), the court relied on federal regulations which stated that a highway section which

---

[12]Among the evidence which was excluded by the trial court, but which appears in appellant's appendices in connection with its evidentiary claims, are the City's agreements with developers for the funding of SR 56 through the FUA. Appellant also submitted evidence that acquisition of rights of way through the FUA is scheduled for 1992. In its petition for rehearing, DMTC relies on excerpts from Caltrans project reports and route concept reports to show Caltrans officials felt there was a possibility a roadway could pass through the FUA, independent of any voter approval of more dense development there, "for intraregional transportation purposes." Even assuming we should consider this belatedly cited evidence, this showing that, as of the time the EIR was drafted and approved, the road possibly could have been built through the FUA is not the same as showing it was likely to be built in the reasonably foreseeable future regardless of whether denser development was approved by the electorate at any particular time.

would be entitled to separate environmental review is one which is (a) of substantial length and (b) between logical terminal points (termini) (defined as major crossroads, population centers, major traffic generators, or similar major highway control elements). (*Ibid.*) As a second criterion, the court stated that case law has required a separately reviewable highway section to have "independent utility." Third, "[a]nother criterion for determining the reasonableness of a proposed highway segment 'is whether the length selected assures adequate opportunity for the consideration of alternatives . . . .' [Citations.]" (*Id.* at p. 1110.) Fourth, it must be addressed whether the segment under consideration seems to fulfill important state and local needs, such as relieving particular traffic congestion. (*Ibid.*)

■ Applying the *Daly* v. *Volpe* (*supra,* 514 F.2d 1106) criteria, as we have found appropriate in this context, it is clear that there is substantial evidence in light of the whole record to support the city council's decision to certify the EIR and approve the SR 56 West project. First, the city council could reasonably have concluded that SR 56 West connects logical termini within the North City West and Sorrento Hills communities, extending from nearby I-5 and going past Carmel Country Road to the east. A primary purpose of the SR 56 West project is stated in the EIR as accommodating projected east-west traffic volumes in the planned urbanizing section of Carmel Valley Road. The EIR also evaluates the east and west segments of SR 56 as standing on their own as separate roadway projects, regardless of any future connection of SR 56 through the FUA. The EIR further evaluates the project as "substantially improving traffic flows on Carmel Valley Road, especially during peak periods."

Although, as planned, SR 56 West does not (yet) connect with I-5 at its western end (since federal environmental compliance documentation was still ongoing at the time the EIR was certified, regarding the separate I-5/I-805 widening and interchange construction at Carmel Valley Road), planning for a terminal point of SR 56 West at .6 miles east of I-5 was not unreasonable in light of a projected connection at a future time. The EIR adequately explains the selection of these termini for the proposed SR 56 West.

Similarly, other criteria set forth in *Daly* v. *Volpe, supra,* 514 F.2d 1106, i.e. whether the project has substantial independent utility, and whether the highway segment serves local and state needs, find support in the record. Construction of SR 56 West is anticipated to reduce existing traffic congestion, and to accommodate predicted future increased traffic volume in the communities in that area. A Route 56 West traffic study in the record states

that the project "will dramatically improve traffic flow on Carmel Valley Road, and allow it to function during peak periods in the future. As major developments in this area continue, this project should contribute to traffic safety and reduced congestion by replacing city street intersections with safer, more efficient freeway interchanges." The EIR further concludes, "The SR 56 West project is a short stub of freeway that is still viable even without the I-5/805 widening and direct connectors. Should the connectors not be built, SR 56 West traffic would access I-5 via the existing diamond interchange at Carmel Valley Road . . . [s]hould the 56 West project not be built, CALTRANS would still intend to construct the I-5/805 widening and direct connectors to Carmel Valley Road." Evidently, the various components of the overall SR 56 corridor were evaluated by the preparers of the EIR as separate projects with independent utility, regardless of the completion or noncompletion of each other portion of the overall project.

We must not overlook the fact that this project as defined in the EIR includes not only the 1.8 miles of SR 56 West, but also the portions of the project covered by CVREP, the drainage and sediment control channel design. CVREP will create a heavily vegetated and natural appearing channel which will use dense riparian vegetation to reduce water velocity and trap sedimentation before it reaches Los Penasquitos Lagoon. CVREP will also include a landscaped greenbelt with an equestrian trail, bicycle lane, and pedestrian path. This portion of the project will result in public benefits which meet the criteria set forth in *Daly* v. *Volpe, supra,* 514 F.2d 1106: Independent utility of the project and the meeting of local and state needs for such amenities. (See Guidelines, § 15126, subd. (g).) The merits of the CVREP portion of the project clearly stand independent of any future connection between SR 56 West and I-15.

In conclusion on this topic, we consider whether separate evaluation of SR 56 West served to irretrievably commit the City and Caltrans to completion of the entire potential SR 56 corridor, or whether this project interferes with future consideration of alternatives. (*Daly* v. *Volpe, supra,* 514 F.2d at p. 1110.) Where a particular highway segment has local utility, its construction does not require the preparation of a corridor environmental impact statement under federal law where there has been no irreversible or irretrievable commitment of federal funds for the entire corridor. (*Conservation Soc. of So. Vt.* v. *Secretary of Tran.* (2d Cir. 1976) 531 F.2d 637, 640.)

Here, approval of the SR 56 West project does not commit the City and Caltrans to a definite course of action in regard to any other project. (Guidelines, § 15352, subd. (a); *Stand Tall on Principles* v. *Shasta Union*

*High Sch. Dist.* (1991) 235 Cal.App.3d 772, 781 [1 Cal.Rptr.2d 107].)
Currently, there is no defined project to construct SR 56 through the City's
FUA, and approval of the electorate would be required for any such con-
struction. A freeway connection through the FUA could only be built if
further environmental analysis showed such construction could be done
consistent with CEQA. Although rights of way acquisition has been dis-
cussed with developers, funding is not yet available for construction of the
possible connection of SR 56 through the FUA. These matters were dis-
cussed at the city council hearing on the project. Given these uncertainties,
there is still room for future consideration of alternative alignments to
connect SR 56 West to I-15.

## C

### *Application of State Standard*

■ We have concluded above that the criteria set forth in *Daly* v. *Volpe,*
*supra,* 514 F.2d 1106, 1109-1110, were satisfied by the material set forth in
the EIR. Assuming, however, that the test set forth in *Laurel Heights, supra,*
47 Cal.3d 376, 394-396 for inclusion in an EIR of analysis of the environ-
mental effects of future expansion or other action must also be satisfied here,
discussion "in at least general terms" (*id.* at p. 398) of the possible future
connection of SR 56 West with both I-15 and I-5 is required. This general
discussion requirement must be limited by the related rule that where a
proposed project itself is fully evaluated in an EIR, it is not improper to omit
discussions of other separate projects. (*Village Laguna of Laguna Beach, Inc.*
v. *Board of Supervisors* (1982) 134 Cal.App.3d 1022, 1031 [185 Cal.Rptr.
41].) Our review of the record shows that this EIR meets these standards.

The final EIR assumes an ultimate linkage between I-5 and I-15 for
purposes of analyzing potential noise levels created by the SR 56 West
project. The same "worst case" scenario was used, assuming such a connec-
tion, for analyzing air quality effects of the project. The EIR also makes note
that for any such proposed project connecting the two interstate freeways, a
vote of the electorate to run the freeway through the FUA would be required,
as would be a future EIR for that specific project. SANDAG regional traffic
reports relied on in the EIR assume such a connection will ultimately take
place. The regional traffic plan is also consistent with such an assumption.
The analysis in the EIR of the cumulative impact of the project notes that a
final federal environmental impact statement (EIS) for the I-5/I-805 widen-
ing project was in preparation, but that because the future connection of

SR 56 West from I-5 to I-15 was not a defined project at that time, or in the near future, no significant cumulative impacts related to such a possible future connection were addressed in the EIR. However, the EIR notes that this ultimate connection between the interstates along a proposed SR 56 is shown on the adopted circulation element of the City's general plan, and would be anticipated to be incorporated in future land use plans for the FUA. The report continues "[w]hen such a project is proposed, it would be subject to complete environmental review."

All these various components of the EIR show that the potential future connection between I-5 and I-15 via an SR 56 corridor was no secret, was a separate and future project, and was adequately disclosed both to the public and to the City's decision makers in the EIR. (9) " 'An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible. . . .' [Citations.]" (*Rio Vista Farm Bureau Center* v. *County of Solano* (1992) 5 Cal.App.4th 351, 368 [7 Cal.Rptr.2d 307].)

▌ Moreover, express findings made by the city council in resolution No. R-275679, amending the applicable land use plans, specify that "[a]lthough the proposal is too speculative to analyze from an environmental standpoint at this time, in the event that SR-56 West is extended through the City's Future Urbanizing Area to connect I-5 to I-15, Caltrans agrees to provide and construct northbound freeway connectors at the junction of I-5 and SR-56 within three years after completion of the possible, future connection of SR-56 through the Future Urbanizing Area to I-15." The City thus fully disclosed the contingent nature of any potential future connection, while at the same time ensuring that its overall transportation scheme for the area was made known to the public.

▌ Of course, we recognize that "CEQA mandates '. . . that environmental considerations do not become submerged by chopping a large project into many little ones—each with a . . . potential impact on the environment —which cumulatively may have disastrous consequences.' [Citation.]" (*City of Santee* v. *County of San Diego* (1989) 214 Cal.App.3d 1438, 1452 [263 Cal.Rptr. 340].) Where, however, environmental review of one project includes in general terms discussion of the potential effects of an anticipated future project, which is still contingent upon the happening of events which are currently outside the powers of the decision makers to cause, we do not

believe such an EIR can be said to have failed to fulfill its purpose of providing adequate, complete, and good faith efforts at full disclosure of information about the effect which the proposed project is likely to have on the environment. (*Rio Vista Farm Bureau Center* v. *County of Solano, supra,* 5 Cal.App.4th at p. 368.) ▮▮▮ That is the case here. The criteria set forth in *Laurel Heights, supra,* 47 Cal.3d 376, for evaluation of future action have thus been adequately satisfied by this EIR. Substantial evidence supports the determination of the City that this project was not an improper segmentation of a larger project and was adequately described in the EIR, which was thus appropriately certified. The particular interdependence of road projects does not compel a different result.

### III

*Adequacy of the EIR: Cumulative Impacts, Alternatives, and Mitigation*

DMTC's particular challenges to the adequacy of the EIR are based upon its assumption that the project description in the EIR is misleading and represents an inappropriate segmentation of a larger project, the SR 56 corridor. DMTC accordingly claims that the analyses in the EIR of the cumulative impacts of the project (Guidelines, § 15130), the feasible alternatives (§ 21002), and the mitigating measures for the project (§ 21081, subd. (a)) are all inadequate. Because we have found above (see pt. II, *ante*) that the project description was adequate and does not represent an improper segmentation of an overall project for environmental review purposes, only a brief discussion of these specific arguments is necessary. ▮▮▮ Again, we emphasize that in judicial review of an agency's decision under CEQA, a court does not pass upon the correctness of an EIR's environmental conclusions, but only determines whether the EIR is sufficient as an informational document. (*Kings County, supra,* 221 Cal.App.3d 692, 711.) Under the Guidelines, section 15151, an EIR must be prepared with sufficient analysis to provide the decision makers with enough information to enable them to make an intelligent decision which takes into account environmental consequences. A finding that the agency prejudicially abused its discretion is justified if the failure to include relevant information precluded informed decisionmaking and/or informed public participation. (*Laurel Heights, supra,* 47 Cal.3d at pp. 403-405.) With these standards in mind, we discuss DMTC's three areas of disagreement with the EIR analysis.

### A

*Cumulative Impacts*

▮▮▮ First, with regard to the cumulative impacts of the project, the Guidelines require the EIR to discuss such impacts when they are significant. (Guidelines, § 15130, subd. (a).) Section 15355 of the Guidelines

defines cumulative impact as "two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts." In *Kings County, supra,* 221 Cal.App.3d 692, 718-721, the court found that the EIR in that case improperly focused upon the individual project's relative effects, and should not have omitted the facts which would have analyzed the collective effect it, among other sources, would have upon air quality. Thus, the court concluded that a cumulative impact analysis must assess the collective or combined effect of such activity in the area. (*Id.* at p. 721.)

The Guidelines at section 15130, subdivision (b), specify that while a discussion of cumulative impact must reflect the severity and likelihood of occurrence of the impact, "the discussion need not provide as great detail as is provided of the effects attributable to the project alone. The discussion should be guided by the standards of practicality and reasonableness." (*Ibid.*) It is then specified that such a discussion shall include a list of "past, present, and reasonably anticipated future projects producing related or cumulative impacts, including those projects outside the control of the agency." (Guidelines, § 15130, subd. (b)(1)(A).) As explained above, the eventual possible connection of I-5 and I-15 with a proposed SR 56 highway extending through the FUA was not, at the time the EIR was prepared, even a "reasonably anticipated future project," since it was not yet a project and would not become one until planning began for the use of the FUA. (See fn. 12, *ante,* and DMTC's request for judicial notice of the FUA dEIR, discussed in pt. IV, *post.*) The Supreme Court has recognized that an EIR need not contain discussion of specific future action "that is merely contemplated or a gleam in a planner's eye." (*Laurel Heights, supra,* 47 Cal.3d 376, 398.) For example, in *San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1984) 151 Cal.App.3d 61, 74, footnote 14 [198 Cal.Rptr. 634], it was suggested that "[t]he problem of where to draw the line on 'projects under review' that must be included in the cumulative impact analysis of a particular project could be solved by the use of a reasonable cutoff date which could be set for every project according to a standard procedure."

To the extent possible, however, the EIR does discuss the regional significance for planning purposes of a fully completed SR 56. The EIR reports that the ultimate connection of SR 56 to I-15 is proposed in regional transportation plans and in the City's general plan. The analyses in the EIR of noise and air quality impacts both utilize figures that are based on an assumption that SR 56 West is connected to I-15. In response to comments, the authors of the EIR disclosed that SR 56 West was designed to accommodate projected traffic volumes that assumed a future highway connection

between I-5 and I-15. When a project proposal for alignment of a route through the FUA from SR 56 West to I-15 is developed, further environmental review will be required at that time.

At the time this EIR was prepared, it was not unreasonable for it to include an assumption of no growth in the FUA because of the requirements of Proposition A, the managed growth initiative, for approval of the electorate before development proceeds in the FUA. As currently formulated, the EIR properly describes the project under consideration, not a different and future project. (*Village Laguna of Laguna Beach, Inc.* v. *Board of Supervisors, supra,* 134 Cal.App.3d at p. 1032.) More detailed analysis of such potential future activity would have been unduly speculative. (*Laurel Heights, supra,* 47 Cal.3d at p. 396.)

*B*

*Feasible Alternatives*

Turning to DMTC's contention that the EIR inadequately analyzes the feasible alternatives to the proposed project, we first set forth the standard for evaluation of such a claim as stated in *Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d 553, 564-566. ██ "In determining the nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of 'feasibility.' . . . [¶] The Legislature has defined 'feasible,' for purposes of CEQA review, as 'capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors. [Citations.] Both the California and the federal courts have further declared that '[t]he statutory requirements for consideration of alternatives must be judged against a rule of reason.' [Citations.]" (*Id.* at p. 565.)

*Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d 553, 566, further establishes that in evaluating the scope of alternatives to be analyzed in an EIR, each case must be evaluated on its facts, which in turn must be reviewed in light of CEQA statutory purposes. (*Ibid.*)

██ DMTC complains that in light of the narrowly defined project description and an allegedly predetermined alignment of the project along Carmel Valley Road, based on the planned development in the area, the feasible alternatives analysis was cursory and incomplete. It points out that all alternative route alignments for the project had been discarded by the time of the final EIR.

The EIR shows that the City and Caltrans conducted an analysis of the "no project" alternative, as well as three other potential alignments of the SR 56 West project. Caltrans's traffic projections led it to conclude that even if SR 56 were constructed at a different location, other than along Carmel Valley Road, "the projected traffic demand on Carmel Valley Road would still be beyond the capacity of a city street and interchange, and would require direct connectors to I-5." The EIR goes into detail about the three suggested alternative alignments, and rejects each of them for specific reasons. Such reasons include steep grades along the routes, probable traffic weaving problems, and the necessity for a series of cuts and fills to cross finger canyons that have been designated as open space in the community plans, with a result of significant land form and visual impact. Alternative channel and roadway designs for the CVREP portion of the project were also discussed. A table was prepared for the EIR setting forth a comparison of the various alternative routes with respect to various criteria, including biological resources, noise, air quality, and related concerns. Also, the city council hearing was continued for a short period in order to allow one council member to investigate by Jeep the alternative preferred by DMTC (the "Watson alternative") before the city council decided the matter. Substantial evidence shows that the City and Caltrans used reasonable diligence to investigate project alternatives.

Moreover, the materials cited by DMTC in support of its position that feasible alternatives were not adequately considered are records of planning commission procedures on the various proposed community and general plan changes necessitated by the project. These minutes show, in relevant part, that alternative route alignments for SR 56 West were studied by Caltrans beginning in 1962. The Caltrans representative at the meeting expressed his opinion that the studies made had pretty well exhausted all of the possible alternatives and any other variables that might take place. In short, the record establishes that the material set forth in the EIR concerning the existence of feasible alternatives meets the rule of reason set forth in *Citizens of Goleta Valley* v. *Board of Supervisors, supra,* 52 Cal.3d 553, 565. (Guidelines, § 15364.)

## C

### Mitigation Measures

DMTC next contends that the mitigation measures set forth in the EIR are generally inaccurate and deficient, based in part on its argument that CVREP applies to several other related projects (e.g., the I-5 Widening

Project and El Camino Real), as well as the SR 56 West project. Ongoing changes in open space designations in a planned development ordinance for one particular neighborhood (No. 8) are claimed to show the inadequacies in general of the mitigation plan for the project.[13] In addition, DMTC claims that the mitigation of wetlands losses set forth in the project are made at a smaller ratio than has historically been permitted by the Coastal Commission.

In response, the City and Caltrans point out that CVREP is a comprehensive plan which will mitigate wetland losses and create new wetlands and open spaces, and that the Coastal Commission has granted approval of the CVREP plan. For example, CVREP creates additional wetlands not covered by previous open space designations that have since been rescinded. Moreover, adherence to alleged "historic ratios" is not required by CEQA, which does not mandate similar mitigation for all similar projects. (*San Franciscans for Reasonable Growth* v. *City and County of San Francisco* (1989) 209 Cal.App.3d 1502, 1526 [258 Cal.Rptr. 267].)

Under section 21081, subdivision (a), a public agency may not approve a project for which the EIR identifies significant environmental effects, without a finding that changes or alterations have been incorporated into the project to mitigate or avoid such identified significant environmental effects. In its resolution No. R275678, certifying the EIR, the city council adopted attached findings of mitigation, feasibility of project alternatives, and a mitigation monitoring and reporting program. (§ 21081, subd. (a); Guidelines § 15370.) These findings make reference to the CVREP program. We have been cited to no authority showing that it is improper for such an extensive program to be used for mitigating purposes for more than one project. In any case, the extensive nature of the mitigating measures provided by the CVREP program clearly constitutes substantial evidence supporting the decision of the city council to certify the EIR as adequate.

## IV

### Scope of the Record

■ As we promised in part I, *ante*, we now consider whether the trial court's refusal to allow evidence extraneous to the administrative record to be admitted at trial was prejudicial to DMTC. ■ The general rule is

[13]DMTC's argument here is that the CVREP does not make sense because part of the approval of the project involved passing a planned district ordinance (PDO) affecting open space designations. However, this PDO was rescinded by the city shortly thereafter.

that erroneous exclusion of evidence will be harmless: "(1) Where the evidence was immaterial or of so little materiality or value that its admission would not have had any substantial influence on the result. (2) Where, though material, it would have been merely cumulative or corroborative of evidence properly in the record. (3) Where, though material and not merely cumulative, it would for some other reason have been of no value. [Citations.]" (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 339, p. 346.)

The standard we must apply in evaluating if a prejudicial abuse of discretion occurred due to the absence of information in an EIR was set forth in *Kings County Farm Bureau* v. *City of Hanford, supra,* 221 Cal.App.3d 692, 712: "The absence of information in an EIR . . . does not per se constitute a prejudicial abuse of discretion. [§ 21005.] *A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process.* [Citation.]" (*Id.* at p. 712, italics added; see also Remy, *op. cit. supra,* ch. 9, § B(2), at pp. 152-153.)

As DMTC freely acknowledges in its opening brief, some of the material that was kept out (in the form of the five volumes of appendices to the supplemental and reply points and authorities, the rejected motion to augment the record, and the requests for judicial notice at trial) was duplicative and thus cumulative of material that was already found in the record of proceedings. On the other hand, the documents that were kept out included some not in the record. These were prepared by Caltrans, such as SR 56 route concept and project reports, a 1988 Route 56 growth study, a suggested alternative alignment studies report, a 1987 environmental clearance and other memoranda, as well as regional transportation plans prepared and adopted by SANDAG. The extraneous evidence also included a community plan and related plans for the Sorrento Hills community (site of one of the proposed alternative route alignments). DMTC has highlighted excerpts from some of these documents in its opening brief, in an effort to show a plan by Caltrans to evade appropriate environmental review.

DMTC also complains that some of these documents (e.g., the Sorrento Hills materials, the SANDAG regional transportation plans and the Caltrans route concept reports) were referenced in the record, but their full text was not included therein. However, DMTC does not claim and fails to show that the references to this omitted text did not accurately depict the substance of the omitted material. The EIR contains a history and background of SR 56 dating from 1959; it gives details of alternative alignment studies; and it discusses concerns regarding traffic patterns and growth inducement. We are

unable to conclude from the entire record that any prejudice occurred by way of the cited omissions.

We also fail to see that any abuse of discretion occurred on the part of the trial court when it declined to allow DMTC to amend its petition to expand its claim that the City failed to consider certain relevant environmental information when certifying the EIR. (*Hayutin v. Weintraub* (1962) 207 Cal.App.2d 497, 507 [24 Cal.Rptr. 761].) The alleged "admissions" made by Respondents in their appellate writ papers (i.e., that they produced documents in discovery for DMTC that were not presented to or considered by the City Council when acting as a decision maker in the case) did not raise a new issue in the case that warranted such amendment. The issue of the respondents' alleged failure to disclose relevant information in the EIR had already been generally pled and presented to the trial court as part of the claim of lack of substantial evidence in support of the City's decision.[14]

■ We also find that the trial court correctly granted the City's motion *in limine* to exclude live testimony concerning the subjective reasoning of the decision makers and their staff. "To the extent that appellant seeks to offer extrinsic evidence of the . . . personal opinions or understanding of the project, they may not be employed by us in determining the meaning of [a quasi-legislative decision]. [Citation.]" (*Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, 590 [284 Cal.Rptr. 498].)

■ In any case, the point for which DMTC seeks to bring in extraneous evidence—to show that there is a long-standing state legislative policy to build SR 56 from I-5 to I-15 and ultimately to SR 67, as a regional necessity and a part of the outer loop element of the San Diego metropolitan area—was fully documented in the EIR itself, as well as in the presentations before the planning commission and the city council. There is discussion in the EIR of the potential linkage of I-5 and I-15 through a completed SR 56, and of the suggested alternative alignment studies. Since this record warrants a conclusion that a good faith effort at full disclosure of all relevant information concerning an ultimate connection between I-5 and I-15 was made, we find no prejudicial abuse of discretion through any failure to disclose all pertinent information. (§ 21005; Guidelines, § 15151.)

Even assuming the extraneous material that was not cumulative should have been admitted into evidence, only one reasonable inference may be

---

[14]We need not specifically address DMTC's argument that the trial court abused its discretion in denying leave to supplement the record pursuant to Code of Civil Procedure section 1094.5, subdivision (e), since we have found that administrative mandamus was not the proper form of action in this proceeding.

drawn from the excluded evidence: i.e, adequate disclosure of the SR 56 corridor potential was made. (*Sierra Club* v. *Gilroy City Council, supra,* 222 Cal.App.3d 30, 41-42.) Substantial evidence in the record supports the decision to certify the EIR. Accordingly, remanding to the trial court to consider the evidence would serve no useful purpose. (*Ibid.*)

In conclusion, DMTC has requested this court take judicial notice of the FUA dEIR issued two years after the city council made its decision to certify the EIR in this case. Our review of this matter has addressed the sufficiency of the EIR as an informational document as of the time the city council took its action. We have not accepted DMTC's theory that the extraneous evidence offered showed some kind of hidden agenda or subterfuge on the part of respondents concerning an ultimate connection between I-5 and I-15. (*Sacramento Old City Assn.* v. *City Council* (1991) 229 Cal.App.3d 1011, 1018-1019 [280 Cal.Rptr. 478].) Only relevant evidence is admissible by judicial notice. (*People* v. *Superior Court (Smolin)* (1986) 41 Cal.3d 758, 768 [225 Cal.Rptr. 438, 716 P.2d 991] revd. on other grounds *California* v. *Superior Court of California* (1987) 482 U.S. 400 [96 L.Ed.2d 332, 107 S.Ct. 2433].) We decline to take judicial notice of the FUA dEIR as requested. (Evid. Code, §§ 452, subds. (b), (c), (d), 453, 459; Code Civ. Proc., § 909.)[15]

## DISPOSITION

The judgment is affirmed.

Work, Acting P. J., and Nares, J., concurred.

A petition for a rehearing was denied November 16, 1992, and the opinion was modified to read as printed above.

---

[15]In light of the conclusions reached above, the issue of DMTC's request for attorney fees under Code of Civil Procedure section 1021.5 is moot.